Commissioner of the N.Y. State Dept. of Transp. v Polite (2024 NY Slip Op 06023)

Commissioner of the N.Y. State Dept. of Transp. v Polite

2024 NY Slip Op 06023

Decided on December 4, 2024

Appellate Division, Second Department

Connolly, J.P.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on December 4, 2024
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

FRANCESCA E. CONNOLLY, J.P.
JOSEPH J. MALTESE
DEBORAH A. DOWLING
BARRY E. WARHIT, JJ.

2020-05137
 (Index No. 610010/19)

[*1]Commissioner of the New York State Department of Transportation, et al., respondents-appellants, 
v
Bryan A. Polite, et al., appellants-respondents, Larry Clark, et al., respondents, et al., defendant.

APPEAL by the defendants Bryan A. Polite, Launcelot A. Gumbs, Seneca Bowen, Daniel Collins, Sr., Germain Smith, Donald Williams, Jr., and Linda Franklin, and CROSS-APPEAL by the plaintiffs, in an action, inter alia, to enjoin the construction and operation of certain structures and for related declaratory relief, from an order of the Supreme Court (Sanford Neil Berland, J.), dated May 18, 2020, and entered in Suffolk County. The order, insofar as appealed from, denied the motion of the defendants Bryan A. Polite, Launcelot A. Gumbs, Seneca Bowen, Daniel Collins, Sr., Germain Smith, Donald Williams, Jr., and Linda Franklin pursuant to CPLR 3211(a) to dismiss the amended complaint insofar as asserted against them. The order, insofar as cross-appealed from, denied the plaintiffs' motion for a preliminary injunction enjoining the defendants from constructing, operating, and maintaining the subject structures during the pendency of this action.

Lippes Mathias LLP, Buffalo, NY (Carol E. Heckman, Stephen D. Daly, and Lee M. Redeye of counsel), for appellants-respondents.
Letitia James, Attorney General, Albany, NY (Jeffrey W. Lang and Jonathan D. Hitsous of counsel), for respondents-appellants.
Shawn J. Wallach, New York, NY (Sean F. Byrnes, pro hac vice, and John F. Byrnes, pro hac vice, of counsel), for respondents.

CONNOLLY, J.P.

OPINION & ORDER
In this case of first impression, we must determine under what circumstances, if any, officials of a sovereign Native American nation may be sued in New York State courts for their off-reservation actions, which allegedly were taken in their official capacities and which allegedly violate New York State law. We hold that Native American nation officials may be sued in New York State courts to enjoin their off-reservation, ongoing violations of New York State law under a theory analogous to the theory announced in Ex parte Young (209 US 123, 159-160).
I. Factual and Procedural Background
Nonparty Shinnecock Indian Nation (hereinafter the Nation) is a federally recognized Indian Tribe. The defendants Bryan A. Polite, Launcelot A. Gumbs, Seneca Bowen, Daniel Collins, Sr., Germain Smith, Donald Williams, Jr., and Linda Franklin (hereinafter collectively the Trustee defendants) are members of the Council of Trustees of the Nation, which is the governing body of the Nation pursuant to its Constitution.
The Nation owns certain land known as the Westwoods, which consists of approximately 80 acres located west of the Shinnecock Canal. The Shinnecock Reservation (hereinafter the Reservation) is located east of the Shinnecock Canal in Southampton. The Westwoods allegedly is not part of the Reservation, nor is it held in trust by the federal Bureau of Indian Affairs.
In 1959, the plaintiff State of New York allegedly acquired a permanent easement for highway purposes over approximately 3.62 acres of the Westwoods (hereinafter the subject property). Thereafter, the State built Sunrise Highway, also known as State Route 27 (hereinafter the highway), which runs through the subject property. The State, through the Department of Transportation (hereinafter the DOT), operates and maintains the highway.
In or around 2019, the Trustee defendants allegedly entered into a contract with the defendants Larry Clark, Digital Outdoor Advertising, LLC, Idon Media, LLC, and/or Iconic Digital Displays, LLC, to construct and operate two structures, which the plaintiffs refer to as billboards and which the Trustee defendants refer to as monuments (hereinafter the structures), within the right-of-way for the highway in the State's easement. Pursuant to the contract, the Nation would own the two structures. According to engineering plans allegedly provided by the defendants to the plaintiffs, each of the structures would be approximately 60 feet tall and 20 feet wide. Those same plans show that the tops of each of the structures would display the Nation's seal and the centers would have double-sided LED displays that would be approximately 30 feet by 20 feet [FN1]. The plans show what appears to be a car advertisement on one of the center LED displays.
In March and April 2019, the defendants allegedly had trees cut and removed from within the highway right-of-way, without obtaining a work permit from the DOT, and the DOT allegedly issued two stop work orders to the defendants' alleged contractors. Thereafter, the defendants allegedly began trenching and placed large equipment, a pile of stones, and support piles within the highway right-of-way, without a work permit from the DOT. The DOT allegedly issued another stop work order and a cease and desist letter to the defendants. The plaintiffs alleged that the defendants ignored the stop work orders and the cease and desist letter.
On May 24, 2019, the plaintiffs commenced this action against the Trustee defendants in their official capacities; Clark, Digital Outdoor Advertising, LLC, and Idon Media, LLC (hereinafter collectively the commercial defendants); and another entity. The Nation is not named as a party in this action.
The plaintiffs subsequently served an amended complaint. The amended complaint asserted three causes of action against all defendants. The first cause of action alleged that the defendants were committing a continuing violation of Highway Law § 52 by installing the structures within the highway right-of-way without obtaining a work permit. On this cause of action, the plaintiffs sought a judgment declaring that the defendants were in violation of the Highway Law and the Real Property Actions and Proceedings Law, a permanent injunction barring the defendants from installing, improving, or constructing any structures within the highway right-of-way, and penalties, interest, and continuing damages of a minimum of $25 to a maximum of $1,000 per day, plus interest, for as long as the violations continued. The second cause of action alleged that the defendants created and continued to maintain a public nuisance by erecting, placing, installing, and continuing to maintain the structures. On this cause of action, the plaintiffs sought a direction that the defendants remove all of the improvements and structures encroaching upon the highway right-of-way and restore those areas to DOT standards, and compensatory and punitive damages. The third cause of action sought a direction that the defendants remove all of the improvements and structures encroaching upon the highway right-of-way and restore those areas to DOT standards, and to permanently enjoin, in effect, any further interference with the State's property rights. The plaintiffs alleged, among other things, that the removal of the structures would not cause a substantial injury or create an undue burden to the defendants because they had not completed construction at that time.
Instead of interposing an answer, the Trustee defendants moved pursuant to CPLR 3211(a) to dismiss the amended complaint insofar as asserted against them. The Trustee defendants contended that the Nation had sovereign immunity from suits in New York State courts and that the [*2]Nation's sovereign immunity extended to the Trustee defendants. The Trustee defendants also contended that the amended complaint should be dismissed for failure to join a necessary party, as the Nation could not be joined because of its sovereign immunity.
The plaintiffs opposed the Trustee defendants' motion to dismiss. The plaintiffs contended that the Trustee defendants could be sued in New York State courts to enjoin their violations of state law under a legal theory analogous to the theory announced in Ex parte Young (209 US 123). They also contended that the amended complaint should not be dismissed for failure to join the Nation as a necessary party.
Separately, the plaintiffs moved for a preliminary injunction enjoining the defendants from constructing, operating, and maintaining the structures during the pendency of this action [FN2]. The plaintiffs contended that the Nation owned the Westwoods in fee simple, the State had a permanent easement for highway purposes over the subject property, and the subject property was subject to state regulatory requirements. The plaintiffs further contended that the defendants had failed to comply with state law by failing to obtain the required work permits and were not constructing the structures in accordance with applicable state highway laws. In support of their motion, the plaintiffs submitted, inter alia, an affidavit from Muthiah T. Vijayendran, a licensed professional engineer employed by the DOT, who described, among other things, his safety concerns during and after the construction of the structures.
The commercial defendants opposed the plaintiffs' motion for a preliminary injunction, contending, inter alia, that they and the Nation would suffer irreparable economic harm without advertising revenue from the structures. The commercial defendants also contended that the plaintiffs could not prevail on the merits of the amended complaint because the Westwoods was sovereign Nation land and the State's easement was not valid. Among other things, the commercial defendants submitted an affidavit from Tela Troge, a member of the Nation and a New York-licensed attorney who had represented the Nation at oral argument on the plaintiffs' request for a temporary restraining order. However, there is no indication in the record that the Trustee defendants themselves submitted any evidence in opposition or written opposition to the plaintiffs' motion for a preliminary injunction.[FN3]
By order dated May 18, 2020, the Supreme Court, inter alia, denied the Trustee defendants' motion pursuant to CPLR 3211(a) to dismiss the amended complaint insofar as asserted against them. The court also denied the plaintiffs' motion for a preliminary injunction. The Trustee defendants appeal, and the plaintiffs cross-appeal.
For the reasons set forth below, the Supreme Court should have granted those branches of the Trustee defendants' motion which were to dismiss so much of the first and second causes of action as sought monetary damages, penalties, and interest insofar as asserted against them, but properly denied the remaining branches of the Trustee defendants' motion to dismiss the amended complaint insofar as asserted against them. Moreover, the court should have granted the plaintiffs' motion for a preliminary injunction.
II. The Trustee Defendants' Motion Pursuant to CPLR 3211(a)
A. Sovereign Immunity
Native American nations are "domestic dependent nations" that retain the sovereignty they enjoyed prior to the adoption of the United States Constitution except to the extent that their sovereignty has been abrogated or curtailed by Congress (Michigan v Bay Mills Indian Community, [*3]572 US 782, 788 [internal quotation marks omitted]; see Cayuga Nation v Campbell, 34 NY3d 282, 291, 293; Unkechaug Indian Nation v Treadwell, 192 AD3d 729, 731). As such, Native American nations "possess the common-law immunity traditionally enjoyed by sovereign powers" (Oneida Indian Nation v Phillips, 981 F3d 157, 170 [2d Cir]; see Unkechaug Indian Nation v Treadwell, 192 AD3d at 731). This includes immunity from suit in New York State courts, absent the consent of the Native American nation (see Ellenbast v Watkins, 32 AD3d 991, 991). Thus, it is undisputed that the Nation has sovereign immunity and cannot be sued in this action without its consent, which it has not given (see id.; Doe v Oneida Indian Nation of N.Y., 278 AD2d 564, 565).
Moreover, the doctrine of Native American nation sovereign immunity extends to individual officials of Native American nations acting in their representative capacity and within the scope of their authority (see Zeth v Johnson, 309 AD2d 1247, 1248). Although members of a Native American nation, "even officials, are amenable to suit if the subject of the suit is not related to the officials' performance of official duties" (id.; see Puyallup Tribe, Inc. v Department of Game of Wash., 433 US 165, 171), here, the amended complaint alleged that each of the Trustee defendants acted in their official capacities. Accordingly, the Trustee defendants contend that the Nation's sovereign immunity extends to them and that they cannot be sued for actions taken in their official capacity on behalf of the Nation.
However, notwithstanding sovereign immunity, Native Americans "going beyond reservation boundaries are subject to any generally applicable state law," "[u]nless federal law provides differently" (Michigan v Bay Mills Indian Community, 572 US at 795 [internal quotation marks omitted]; see Wagnon v Prairie Band Potawatomi Nation, 546 US 95, 113; Gingras v Think Fin., Inc., 922 F3d 112, 121 [2d Cir]). Here, the plaintiffs alleged that the structures are being constructed upon the subject property, over which the State has a permanent easement. The plaintiffs further alleged that the subject property is not aboriginal or sovereign land of the Nation, the Nation owns the subject property in fee simple, and the subject property is not part of the Reservation nor held in trust by the federal government. Thus, according to the plaintiffs, the Trustee defendants have engaged in conduct "beyond reservation boundaries," and they are subject to generally applicable state laws (Michigan v Bay Mills Indian Community, 572 US at 795 [internal quotation marks omitted]; see Gingras v Think Fin., Inc., 922 F3d at 121). Nevertheless, there is a difference between demanding that Native American nations and their officials comply with state law and having the means available to force them to do so (see Kiowa Tribe of Okla. v Manufacturing Technologies, Inc., 523 US 751, 755; Gingras v Think Fin., Inc., 922 F3d at 121).
Relying upon a theory analogous to the theory announced by the United States Supreme Court in Ex parte Young (209 US 123), the plaintiffs contend that there is an exception to sovereign immunity that allows for actions against officials of Native American nations to enjoin ongoing violations of state law. In Ex parte Young (209 US at 159-160), the United States Supreme Court held that although the states have sovereign immunity, where state officials claim to be acting under the authority of the state, they can be sued to enjoin ongoing violations of federal law.
"If the act which the state [officer] seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he [or she] is in that case stripped of his [or her] official or representative character and is subjected in his [or her] person to the consequences of his [or her] individual conduct. The state has no power to impart to him [or her] any immunity from responsibility to the supreme authority of the United States" (id.).
Thus, under the Ex parte Young exception to state sovereign immunity, although federal courts cannot give orders directly to a state, federal courts can enjoin state officials in their official capacity from ongoing violations of federal law (see Hutto v Finney, 437 US 678, 690; Edelman v Jordan, 415 US 651, 664).
Similarly, officials of Native American nations may be sued in their official capacities for prospective injunctive relief based on violations of federal law (see Gingras v Think Fin., Inc., 922 F3d at 121; Garcia v Akwesasne Hous. Auth., 268 F3d 76, 87 [2d Cir]). Here, however, the amended complaint alleged that the Nation officials violated state law, and the action was commenced in a New York State court.
The issue of whether officials of a Native American nation may be sued in New York State courts for alleged violations of New York State law under a theory analogous to Ex parte Young appears to be one of first impression. Nonetheless, other courts have addressed the issue of whether officials of Native American nations may be sued in their official capacities for off-reservation violations of state law, and the majority of those courts have held that such suits are permissible under a theory analogous to Ex parte Young. We similarly hold that Native American nation officials may be sued in New York State courts for off-reservation violations of New York State law under a theory analogous to Ex parte Young.
1. Michigan v Bay Mills Indian Community
The decision of the United States Supreme Court in Michigan v Bay Mills Indian Community (572 US 782) supports our conclusion. In Michigan v Bay Mills Indian Community, Michigan sued the Bay Mills Indian Community (hereinafter Bay Mills), a federally recognized Native American nation, to enjoin operation of a casino on property that Bay Mills had purchased and that was approximately 125 miles from Bay Mills' reservation (see id. at 785-786). Michigan alleged, among other things, that the casino violated the Indian Gaming Regulatory Act (25 USC § 2701 et seq.; hereinafter the IGRA) because it was located outside of "Indian lands," as that term was defined under the IGRA, and the IGRA abrogated Bay Mills' sovereign immunity from Michigan's suit (see Michigan v Bay Mills Indian Community, 572 US at 787, 791)[FN4]. However, the Court held that the IGRA only abrogated Bay Mills' sovereign immunity on Indian lands, and the premise of Michigan's suit was that the casino was outside of Indian lands (see id. at 791). The Court held that the IGRA affords tools for state or federal officials to regulate gaming on Indian lands and nowhere else, and the "IGRA's abrogation of tribal immunity does that as well" (id. at 795).
However, the Supreme Court stated that "the resulting world, when considered functionally, is not nearly so enigmatic as Michigan suggests" (id. [alteration and internal quotation marks omitted]). Although a state lacks the ability to sue a Native American nation itself for illegal gaming when that activity occurs off the reservation, a state, "on its own lands, has many other powers over tribal gaming that it does not possess (absent consent) in Indian territory" (id.). "So, for example, Michigan could, in the first instance, deny a license to Bay Mills for an off-reservation casino" (id. at 795-796, citing Mich Comp Laws Ann §§ 432.206-432.206a). "And if Bay Mills went ahead anyway, Michigan could bring suit against tribal officials or employees (rather than the Tribe itself) seeking an injunction for, say, gambling without a license" (id. at 796, citing Mich Comp Laws Ann §§ 432.220, 600.3801[1][a]). "As this Court has stated before, analogizing to Ex parte Young, tribal immunity does not bar such a suit for injunctive relief against individuals, including tribal officers, responsible for unlawful conduct" (id. [citation and emphasis omitted], citing Santa Clara Pueblo v Martinez, 436 US 49, 59).
We reject the Trustee defendants' contention that we should not rely upon Bay Mills because the Supreme Court's statements about states bringing suits against officials of Native American nations to enforce state law were purportedly mere dicta. Initially, both the United States Court of Appeals for the Second Circuit and the Connecticut Supreme Court have analyzed the relevant language in Bay Mills and concluded that it was not dicta (see Gingras v Think Fin., Inc., 922 F3d 112; Great Plains Lending, LLC v Department of Banking, 339 Conn 112, 155, 259 A3d 1128, 1156), although at least one other court has concluded that the same language in Bay Mills was dicta (see Save the Val., LLC v Santa Ynez Band of Chumash Indians, 2015 WL 12552060, *4, 2015 US Dist LEXIS 181545, *9-10 [CD Cal, No. CV 15-02463-RGK (MANx)]). However, we need not [*4]decide whether the relevant language in Bay Mills was dicta (see generally Seminole Tribe of Fla. v Florida, 517 US 44, 67 ["When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound"]).
Even assuming that the discussion of specific alternative remedies available to the states was "not necessary to resolve an issue" in Bay Mills (Pollicino v Roemer & Featherstonhaugh, 277 AD2d 666, 668; see Seminole Tribe of Fla. v Florida, 517 US at 67; Race v Krum, 222 NY 410, 414-415), "neither was it peripheral or so cursory as to suggest the Court gave less than full and careful consideration to the matter" (Hengle v Treppa, 19 F4th 324, 347 [4th Cir] [internal quotation marks omitted]). The availability of alternative remedies, including actions against officials of Native American nations under an Ex parte Young theory, was obviously important to the Court's determination that the IGRA abrogated tribal sovereign immunity solely with respect to gaming on Indian lands, as states already had other means to enforce gaming laws outside of Indian lands (see Michigan v Bay Mills Indian Community, 572 US at 796; Hengle v Treppa, 19 F4th at 347). Further, in rejecting Michigan's contention that Kiowa Tribe of Okla. v Manufacturing Technologies, Inc. (523 US 751) should be overruled, the Court stated that "[a]dhering to stare decisis is particularly appropriate here given that the State . . . has many alternative remedies," but "the situation [c]ould be different if no alternative remedies were available" (Michigan v Bay Mills Indian Community, 572 US at 799 n 8; see Hengle v Treppa, 19 F4th at 347)[FN5]. In short, whether labeled dicta or not, we find the reasoning of Bay Mills persuasive (see Hengle v Treppa, 19 F4th at 347; see generally Race v Krum, 222 NY at 414-415 ["While it may be true . . . that such statements cannot be considered as settling the law on the subject, inasmuch as the same were not necessary to the decision, they are, nevertheless, valuable as indicating the view of the writer of the opinion in each case as to what the law is or ought to be" (citations omitted)]).
2. Other Cases
Moreover, the majority of courts considering the issue have concluded that officials of Native American nations may be sued in their official capacities for off-reservation violations of state law under a theory analogous to Ex parte Young. These courts include the Second Circuit (see Gingras v Think Fin., Inc., 922 F3d at 120-121), the United States Court of Appeals for the Fourth Circuit (see Hengle v Treppa, 19 F4th at 345), the United States Court of Appeals for the Eleventh Circuit (see Alabama v PCI Gaming Auth., 801 F3d 1278, 1290 [11th Cir]), and the Connecticut Supreme Court (see Great Plains Lending, LLC v Department of Banking, 339 Conn at 115, 153, 156, 259 A3d at 1134, 1154-1157). Although these decisions are not binding upon us, we find their reasoning, including their reliance upon Bay Mills, persuasive.
Nonetheless, our dissenting colleague relies upon California v Azuma Corp. (2024 WL 266121, *5, 2024 US Dist LEXIS 12817, *13-14 [ED Cal, No. 2:23-cv-00743-KJM-DB]), which appears to be an outlier [FN6]. In that case, the United States District Court for the Eastern District of California held that Ex parte Young does not extend to suits against Native American nation officials for violations of state law. Relying upon, inter alia, Pennhurst State School and Hospital v Halderman (465 US 89, 106), the court held that "[a]s a remedy designed to end a continuing violation of federal law, Ex parte Young gives life to the Supremacy Clause by vindicating federal interests and assuring the supremacy of federal law" (California v Azuma Corp., 2024 WL 266121, *5, 2024 US Dist LEXIS 12817, *14 [internal quotation marks omitted]). However, "[a] grant of relief based on state law . . . does not vindicate the supreme authority of federal law" (2024 WL 266121, *5, 2024 US Dist LEXIS 12817, *14-15 [internal quotation marks omitted]). "Thus, [*5]violations of state law do not implicate the Ex parte Young doctrine; the tribal officers, as sued in their official capacities, are immune from liability for violations of state law" (2024 WL 266121, *5, 2024 US Dist LEXIS 12817, *15).
We respectfully disagree with our dissenting colleague and the Eastern District of California that a theory analogous to Ex parte Young can only be used to vindicate violations of federal law. First, this conclusion is expressly contradicted by the language used by the United States Supreme Court in Bay Mills, which referenced Ex parte Young—type lawsuits to vindicate violations of state law (see Michigan v Bay Mills Indian Community, 572 US at 795-796). Further, the Eastern District of California's reliance, as well as the Trustee defendants' reliance, on Pennhurst State School and Hospital v Halderman (465 US 89) is misplaced. In Pennhurst State School and Hospital v Halderman (465 US at 106), the United States Supreme Court refused to extend the Ex parte Young exception to actions commenced against state officials for alleged violations of their own state's laws. The Court held that "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law" and that "[s]uch a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment" (id.).
However, we agree with the Fourth Circuit that the "sovereignty and federalism concerns underpinning Pennhurst" are not implicated in suits against Native American nation officials for violations of state law (Hengle v Treppa, 19 F4th at 347; see Gingras v Think Fin., Inc., 922 F3d at 123). In suits against officials of Native American nations "like Bay Mills envisioned," courts instruct those officials on how to conform their conduct to state law, not to the laws of their own nation (Hengle v Treppa, 19 F4th at 347; see Gingras v Think Fin., Inc., 922 F3d at 123; see generally Cayuga Nation v Campbell, 34 NY3d at 296). Moreover, although "the Supreme Court has applied the same general rules to [states and Native American nations] when it comes to . . . official-capacity suits, it has acknowledged that tribal immunity is not identical to the immunity the [s]tates enjoy" (Hengle v Treppa, 19 F4th at 348 [citation and internal quotation marks omitted]; see Three Affiliated Tribes of Fort Berthold Reservation v Wold Engineering, P.C., 476 US 877, 890).
Contrary to the opinion of our dissenting colleague, our holding does not rest upon any purported supreme authority of state law over Native American nations and their officials acting in their official capacities. Nor does relying upon a theory analogous to Ex parte Young violate "long-established principles of Native American nation sovereignty" (see Hengle v Treppa, 19 F4th at 347-348 ["Ex parte Young—style claims do not accomplish an extra-congressional abrogation of tribal immunity"]). Instead, claims relying upon a theory analogous to Ex parte Young "present a long-recognized exception to sovereign immunity" (id. at 348 [emphasis omitted]), which has been endorsed by the Supreme Court (see Michigan v Bay Mills Indian Community, 572 US at 796).
Similar to the conclusion reached by the Second Circuit in Gingras v Think Fin., Inc. (922 F3d at 124), "[o]ur holding balances the competing interests of [the Nation and the State] as separate sovereigns" (see Great Plains Lending, LLC v Department of Banking, 339 Conn at 155-156, 259 A3d at 1156). We agree with the Second Circuit that absent Ex parte Young—type actions against officials of Native American nations for violations of state law, the State and its citizens would seemingly be without recourse while Native American nations and their officials "would be free, in conducting affairs outside of reserved lands, to violate state laws with impunity" (Gingras v Think Fin., Inc., 922 F3d at 124; see Great Plains Lending, LLC v Department of Banking, 339 Conn at 156, 259 A3d at 1156).
We also reject the Trustee defendants' contention that actions against Native American officials for violations of state law under a theory analogous to Ex parte Young should only be commenced in federal courts, not state courts. We are mindful of what the Trustee defendants refer to as the "historical and often-adversarial relationship between states and tribes." Nevertheless, we are not the only state to allow actions against officials of Native American nations under a theory analogous to Ex parte Young. In Great Plains Lending, LLC v Department of Banking (339 Conn 112, 259 A3d 1128), the Connecticut Supreme Court recognized the availability of an exception analogous to Ex parte Young in a state court proceeding for violations of state law (see 339 Conn at 115, 153, 156, 259 A3d at 1134, 1154-1157 [holding that the chairman of a federally recognized Native American nation was not immune from prospective injunctive relief for alleged violations of state banking and usury laws for actions taken as an official of his nation]).
Moreover, although the Trustee defendants describe federal courts as a "neutral" forum to "serve as an arbiter between the state and tribe," it is not certain that a federal court would [*6]even be available as a forum in this case. In New York v Shinnecock Indian Nation (686 F3d 133, 141 [2d Cir]), a case involving the Nation and the Westwoods that is discussed further below, the Second Circuit determined that there was no federal question presented in the complaint and, therefore, federal courts did not have subject matter jurisdiction over the case. Accordingly, the Second Circuit remanded the case to New York State courts (see id.). Although we do not opine as to whether federal courts would have subject matter jurisdiction over this case, the potential unavailability of federal courts counsels against us declining to recognize an exception analogous to Ex parte Young for actions against Native American nation officials commenced in our state courts.
3. Except for So Much of the First and Second Causes of Action As Sought to Recover Monetary Damages, Penalties, and Interest, the Amended Complaint Sufficiently Pleaded an Ex Parte Young Theory Against the Trustee Defendants
The Trustee defendants nevertheless urge that even if we recognize the possibility that actions may be commenced in New York State courts against officials of Native American nations for violations of New York State law under a theory analogous to Ex parte Young, the plaintiffs in this case have failed to sufficiently plead an Ex parte Young theory. The Trustee defendants contend that the amended complaint did not seek prospective injunctive relief. In addition, they contend that the amended complaint sought relief against the Nation itself, which they further contend is not permitted under an Ex parte Young theory. We address these contentions in turn.
a. Prospective Injunctive Relief
First, the Trustee defendants contend that the amended complaint did not seek prospective injunctive relief because it sought monetary relief for past wrongs, which is prohibited under the doctrine of Ex parte Young. They further contend that the declaratory and injunctive relief that the plaintiffs sought may not be considered prospective because the amended complaint itself alleged that construction of the structures had been completed and, therefore, the wrong had already occurred. To the extent that these contentions are raised for the first time on appeal, we consider them because they present pure questions of law that appear on the face of the record and could not have been avoided if raised at the proper juncture (see Deutsche Bank Natl. Trust Co. v Lubonty, 208 AD3d 142, 146; Coscia v Jamal, 156 AD3d 861, 864).
Although lawsuits under an Ex parte Young theory are an exception to the doctrine of sovereign immunity, the doctrine does not apply when the sovereign is the real, substantial party in interest (see Virginia Office for Protection and Advocacy v Stewart, 563 US 247, 254-255; Pennhurst State School and Hospital v Halderman, 465 US at 101; Jamul Action Comm. v Simermeyer, 974 F3d 984, 994 [9th Cir]), "as when the 'judgment sought would expend itself on the public treasury or domain, or interfere with public administration'" (Virginia Office for Protection and Advocacy v Stewart, 563 US at 255, quoting Pennhurst State School and Hospital v Halderman, 465 US at 101 n 11 [internal quotation marks omitted]). Actions that "seek to recover funds from tribal coffers or establish vicarious liability of a tribe for damages . . . are barred by tribal sovereign immunity even when nominally styled as against individual officers" (Jamul Action Comm. v Simermeyer, 974 F3d at 994; see Fitzgerald v Wildcat, 687 F Supp 3d 756, 779 [WD Va]; see also Sanders v Parker, 2023 WL 4902496, *5, 2023 US Dist LEXIS 133279, *9-10 [ED NY, No. 22-CV-5141 (PKC) (JRC)] [actions against state officials that, in form or substance, seek compensatory damages, rather than prospective relief, which will be paid with funds from the state treasury, rather than from individual officials, remain barred even when commenced under an Ex parte Young theory]).
By contrast, causes of action "seeking prospective injunctive relief ordinarily may proceed against tribal officers sued in their official capacities under the doctrine of Ex parte Young" (Jamul Action Comm. v Simermeyer, 974 F3d at 994; see Matter of Giaquinto v Commissioner of N.Y. State Dept. of Health, 11 NY3d 179, 188). As explained above, the Ex parte Young doctrine permits actions for prospective nonmonetary relief against state or Native American nation officials in their official capacity to enjoin them from violating state or federal law, without the presence of the immune state or Native American nation (see Jamul Action Comm. v Simermeyer, 974 F3d at 994; Fitzgerald v Wildcat, 687 F Supp 3d at 778). "Declaratory relief may issue against [officials of Native American nations] in the same circumstances" (Jamul Action Comm. v Simermeyer, 974 F3d at 994).
Here, as the Trustee defendants correctly point out, portions of the first and second causes of action sought monetary damages, penalties, and interest. The first cause of action sought, among other things, penalties, interest, and continuing damages of a minimum of $25 to a maximum of $1,000 per day plus interest for as long as the alleged violations of Highway Law § 52 continued. The second cause of action sought, among other things, compensatory and punitive damages. We agree with the Trustee defendants that so much of the first and second causes of action as sought monetary damages, penalties, and interest insofar as asserted against them are barred by the Nation's sovereign immunity and may not proceed against the Trustee defendants, even under an Ex parte Young theory (see Virginia Office for Protection and Advocacy v Stewart, 563 US at 255; Sanders v Parker, 2023 WL 4902496, *5, 2023 US Dist LEXIS 133279, *9-10; Great Plains Lending, LLC v Department of Banking, 339 Conn at 156, 259 A3d at 1156; see also McAuliffe v Carlson, 520 F2d 1305, 1308 [2d Cir] ["Whether the payment is called damages, retroactive payment, or restitution, the effect upon the fisc is the same"]).
Accordingly, we grant those branches of the Trustee defendants' motion which were pursuant to CPLR 3211(a) to dismiss so much of the first and second causes of action as sought monetary damages, penalties, and interest insofar as asserted against them.
Nevertheless, we reject the Trustee defendants' contention that the entire amended complaint should be dismissed insofar as asserted against them because it purportedly only seeks relief to remedy past wrongs (see Great Plains Lending, LLC v Department of Banking, 339 Conn at 156, 259 A3d at 1156 [although Native American nation chairman was immune from civil penalties, he was not immune from prospective injunctive relief]). In determining whether a case falls under the Ex parte Young doctrine, a court should conduct a "straightforward inquiry" into whether the complaint alleges an ongoing violation of the law and seeks prospective relief (Verizon Md. Inc. v Public Serv. Comm'n of Md., 535 US 635, 645 [internal quotation marks omitted]; see Seneca Nation v Hochul, 58 F4th 664, 670 [2d Cir]). "[R]elief that serves to remedy a past violation of the law is retrospective in nature. On the other hand, prospective relief seeks to end an ongoing or future violation of law" (Matter of Giaquinto v Commissioner of N.Y. State Dept. of Health, 11 NY3d at 188). In determining whether the amended complaint seeks relief for an ongoing violation of the law, we are not bound by the form of the relief sought (see Papasan v Allain, 478 US 265, 279; Matter of Giaquinto v Commissioner of N.Y. State Dept. of Health, 11 NY3d at 188; see also Vega v Semple, 963 F3d 259, 282 [2d Cir]). Instead, we review the substance of the relief sought (see Papasan v Allain, 478 US at 279; Matter of Giaquinto v Commissioner of N.Y. State Dept. of Health, 11 NY3d at 188). However, we do not review the merits of whether the plaintiffs ultimately would be entitled to that relief (see Town of Barnstable v O'Connor, 786 F3d 130, 139 [1st Cir]; In re Deposit Ins. Agency, 482 F3d 612, 623 [2d Cir]).
Initially, we reject the Trustee defendants' contention that the amended complaint only alleged a past violation of the law because it alleged that construction of the structures had been completed. To the contrary, the amended complaint expressly alleged that the defendants "have not completed construction at this time." Although the amended complaint alleged that one of the structures was "illuminated and functional" and "operating" "by using a gas-powered generator," these allegations indicate, at most, that, as alleged in the amended complaint, "significant progress" had been made on one structure. Accepting the facts alleged in the amended complaint as true and according the plaintiffs the benefit of every possible favorable inference (see Leon v Martinez, 84 NY2d 83, 87; Zaccaro v Parker, 249 AD2d 1003, 1003), alleging that "significant progress" had been made is not the same thing as alleging that construction of both structures was complete.
Contrary to the contention of the Trustee defendants, by alleging that the defendants were committing ongoing violations of Highway Law § 52, an ongoing public nuisance, and an ongoing interference with the State's easement through their continued construction, operation, and/or maintenance of the structures, the amended complaint sufficiently alleged an ongoing violation of the law for purposes of Ex parte Young. In a similar case, Seneca Nation v Hochul (58 F4th 664), the plaintiff, the Seneca Nation, a federally recognized Native American nation, alleged, among other things, that the defendant State had not obtained a valid easement from the plaintiff in order to operate a portion of the New York State Thruway and that the defendants' operation of the thruway constituted a continuing unauthorized use of operating a toll road without a valid easement in violation of various federal laws (see id. at 667). Although the defendants contended, among other things, that the plaintiff did not allege an ongoing violation of federal law but only an allegation that the past grant of the easement violated federal laws, the Second Circuit disagreed and [*7]held that the plaintiff's allegation that its free use and enjoyment of its protected land is continuously impaired by the presence of an unlawful easement reflected an ongoing harm to the plaintiff (see id. at 670-671). "To be sure, the invalidity of the easement is critical to the plaintiff's case, but this suit is concerned with the ongoing effect of the invalidity" (id. at 670).
So too here—although the defendants' alleged past failure to obtain a work permit in violation of Highway Law § 52 is critical to the plaintiffs' case, this action is concerned with the defendants' alleged ongoing violations of Highway Law § 52, ongoing public nuisance, and ongoing interference with the State's easement, all allegedly caused by the continued construction, operation, and maintenance of the structures (see Seneca Nation v Hochul, 58 F4th at 670; Conservation Law Found., Inc. v Pease Dev. Auth., 2017 WL 4310997, *11, 2017 US Dist LEXIS 157191, *29-31 [D NH, No. 16-cv-493-SM] [although the plaintiff claimed that the defendant violated the Clean Water Act by failing to submit certain documents prior to the expiration of a permit, the plaintiff more broadly asserted that the defendant was currently violating the Clean Water Act in an ongoing manner by continually discharging water without complying with that act's permitting requirements and by discharging municipal stormwater into the waters of the United States without the necessary permit]). Courts are not prohibited from considering the defendants' past conduct as it relates to ongoing or future violations (see Committee to Save Mokelumne Riv. v East Bay Mun. Util. Dist., 13 F3d 305, 310 [9th Cir]; Stannard v State Ctr. Community Coll. Dist., ___ F Supp 3d ___, ___, 2024 WL 2132523, *8, 2024 US Dist LEXIS 86031, *21-22 [ED Cal, No. 1:22-cv-01250-JLT-EPG]).
Thus, the amended complaint does not merely allege a discrete wrongful act of failing to obtain a permit for the construction of structures that have already been completed. As such, we do not consider the instant situation to be sufficiently analogous to an alleged wrongful taking, which occurred before the complaint was filed, and the Trustee defendants' reliance upon such cases is misplaced (see 5465 Rte. 212, LLC v New York State Dept. of Transp., 2020 WL 6888052, *7, 2020 US Dist LEXIS 219700, *17 [ND NY, No. 1:19-cv-01510 (BKS/DJS)]; National R.R. Passenger Corp. v McDonald, 978 F Supp 2d 215, 231 [SD NY], affd 779 F3d 97 [2d Cir]). An allegedly wrongful taking is a discrete act that transfers record title to the state, and use of the property by the state, its present record owner, is simply a "by-product" of the prior allegedly wrongful taking itself (5465 Rte. 212, LLC v New York State Dept. of Transp., 2020 WL 6888052, *7, US Dist LEXIS 219700, *17 [internal quotation marks omitted]; see National R.R. Passenger Corp. v McDonald, 978 F Supp 2d at 231). By contrast, here, the defendants' alleged wrongful acts included the continued construction, operation, and/or maintenance of the structures on the subject property in violation of the law and the plaintiffs' rights under the easement, which they continue to hold.
In this context, we do not view the requests for injunctive and declaratory relief in the amended complaint as impermissibly seeking retrospective relief tantamount to an award of damages for past violations of the law. The injunctive and declaratory relief in the amended complaint sought to halt construction of the structures, remove them, and restore the subject property. Halting construction may be considered prospective relief (see Conservation Law Found., Inc. v Pease Dev. Auth., 2017 WL 4310997, *9, 2017 US Dist LEXIS 157191, *21-22 [an order enjoining the defendant from continuing to violate the Clean Water Act and requiring it to comply with that act's mandates was a request for prospective relief]; see also Franks v Ross, 313 F3d 184, 199 [4th Cir] [seeking to enjoin the construction, operation, and maintenance of a landfill]). Removal of the obstruction and restoration of the land to its prior condition are well-recognized remedies for alleged ongoing interference with an easement holder's rights or to abate a public nuisance (see e.g. Zupa v Keitt, 84 AD3d 792, 794; City of New York v Gowanus Indus. Park, Inc., 65 AD3d 1071, 1074; Green v Mann, 237 AD2d 566, 568). We therefore conclude that under the circumstances of this case, removal of the structures and restoration of the subject property are prospective remedies for an ongoing interference with the State's rights under the easement and to abate an ongoing public nuisance, rather than a remedy for a past wrong (see Seneca Nation v Hochul, 58 F4th at 671 [seeking to compel the defendants to obtain a valid easement on terms that will in the future equitably compensate the plaintiff for future use of its land was prospective relief to remedy the ongoing violation of the plaintiff's free use and enjoyment of its land]; State Empls. Bargaining Agent Coalition v Rowland, 494 F3d 71, 96 [2d Cir] [reinstatement to previous employment satisfied the Ex parte Young exception]; Committee to Save Mokelumne Riv. v East Bay Mun. Util. Dist., 13 F3d at 307 [enjoining the defendants from discharging pollutants from a facility [*8]until they obtained a permit to do so and seeking an order requiring the defendants to devise a remedial plan to remove and dispose of contaminated sediment in a reservoir was prospective equitable relief]; Raritan Baykeeper, Inc. v NL Indus., Inc., 2013 WL 103880, *23, 2013 US Dist LEXIS 2628, *75-77 [D NJ, No. 09-cv-4117 (JAP)] [ordering the state officials to comply with a highway permit and to control any sources of stormwater discharge from the highways that contributed to sediment contamination was prospective injunctive relief]; cf. Merritts v Richards, 62 F4th 764, 771-772 [3d Cir] [allegations that easements were acquired without justification and without just compensation were discrete past actions, not ongoing violations of federal law, and seeking an injunction to cure those past injuries was not a request for prospective injunctive relief]; Doe v Haas, 427 F Supp 3d 336, 348 [ED NY] [request for an injunction to remove all notations on a hearing transcript and record indicating certain violations was not prospective relief where there was no assertion of ongoing violations of the law]). Moreover, this relief, which would serve directly to bring an end to a present violation of the law, is not prohibited, even if it is accompanied by a substantial ancillary effect on the sovereign's treasury (see Papasan v Allain, 478 US at 282; Seneca Nation v Hochul, 58 F4th at 671).
In sum, except for so much of the first and second causes of action as sought monetary damages, penalties, and interest, the remainder of the amended complaint sought prospective injunctive relief for ongoing violations of state law.
b. Relief Against the Sovereign
Nevertheless, even where the complaint seeks prospective injunctive relief, there are limits to the relief that may be sought under an Ex parte Young theory without making the sovereign the real, substantial party in interest (see Virginia Office for Protection and Advocacy v Stewart, 563 US at 255; Jamul Action Comm. v Simermeyer, 974 F3d at 994). "The Supreme Court has disallowed attempts to use the doctrine discussed in Ex parte Young to quiet title to a sovereign's property, to compel a governmental official to pay a sovereign's past legal obligation, or to obtain specific performance of a sovereign's contract" (Jamul Action Comm. v Simermeyer, 974 F3d at 994-995; see Idaho v Coeur d'Alene Tribe of Idaho, 521 US 261, 281-282; see also Western Mohegan Tribe & Nation v Orange County, 395 F3d 18, 23 [2d Cir]). "These remedies, which disturb a sovereign's title to property or reach into its coffers, lie directly against the sovereign even when styled as a claim for injunctive relief against an individual governmental officer" (Jamul Action Comm. v Simermeyer, 974 F3d at 995). However, we do not view the injunctive and declaratory relief sought in the amended complaint as meeting this standard. We therefore respectfully disagree with our dissenting colleague that this case "exceeds the permissible limits" of the Ex parte Young exception and impermissibly makes the Nation the real party in interest.
We reject the Trustee defendants' contention that this action may not proceed against them under an Ex parte Young theory merely because this action will affect the subject property, which the Nation owns, or potentially require the destruction of the structures themselves, which the Nation also owns. Many courts have allowed cases to proceed under an Ex parte Young theory even where the outcome of the case would affect a sovereign's waters or land (see Silva v Farrish, 47 F4th 78, 85 [2d Cir]; Arnett v Myers, 281 F3d 552, 568 [6th Cir]; Hamilton v Myers, 281 F3d 520, 528 [6th Cir]; Unkechaug Indian Nation v New York State Dept. of Envtl. Conservation, 677 F Supp 3d 137, 152 [ED NY]; Ottawa Tribe of Okla. v Speck, 447 F Supp 2d 835, 840 [ND Ohio]; see also Seneca Nation v Hochul, 58 F4th at 673 [affected state's possessory right to property]).
By contrast, the Supreme Court refused to apply the Ex parte Young theory in Idaho v Coeur d'Alene Tribe of Idaho (521 US 261), a case in which a Native American nation sued Idaho to establish its entitlement to the exclusive use, occupancy, and right to quiet enjoyment of certain submerged lands that were within the boundaries of the nation's reservation but had been governed by Idaho for decades (see id. at 264-265). In addition to its title claims, the nation sought a declaration of the invalidity of all Idaho statutes, ordinances, regulations, customs, or usages which purported to regulate, authorize, use, or affect in any way the submerged lands (see id. at 265). The Court held that the declaratory and injunctive relief sought was "the functional equivalent of quiet title in that substantially all benefits of ownership and control would shift from the [s]tate to the [nation]" (id. at 282). The Court further explained that this was "especially troubling when coupled with the far-reaching and invasive relief the [nation] seeks," including, "in effect, a determination that the lands in question are not even within the regulatory jurisdiction of the [s]tate" (id.).
"The requested injunctive relief would bar the [s]tate's principal [*9]officers from exercising their governmental powers and authority over the disputed lands and waters. The suit would diminish, even extinguish, the [s]tate's control over a vast reach of lands and waters long deemed by the [s]tate to be an integral part of its territory" (id.).
Under those "particular and special circumstances," the Court held that Ex parte Young was inapplicable (id. at 287).
But this case does not present the "particular and special circumstances" akin to those in Idaho v Coeur d'Alene Tribe of Idaho (id.; see Muscogee [Cr.] Nation v Rollin, ___ F4th ___, ___, 2024 WL 4471157, *6, 2024 US App LEXIS 25713, *23 [11th Cir, No. 21-11643] [stating that Coeur d'Alene is a narrow exception]; Arnett v Myers, 281 F3d at 568 ["this court does not read the ruling of Coeur d'Alene to extend to every situation where a state property interest is implicated"]; Conservation Law Found., Inc. v Pease Dev. Auth., 2017 WL 4310997, *12, 2017 US Dist LEXIS 157191, *33 [stating that application of Coeur d'Alene is plainly limited to egregious situations in which the relief requested would completely divest the state of sovereign control]). Based on the relevant allegations in the amended complaint, which have been uncontradicted by any evidence submitted by the Trustee defendants, the Nation owns the subject property in fee simple, subject to the State's easement, and even if the plaintiffs were ultimately to prevail in this action, the Nation would continue to own the subject property in fee simple, subject to the State's easement. Unlike Jamul Action Comm. v Simermeyer (974 F3d at 994-995) and Muscogee (Cr.) Nation v Rollin (___ F4th ___, 2024 WL 4471157, 2024 US App LEXIS 25713), here, the Trustee defendants have not argued that this action is the functional equivalent of a quiet title action [FN7]. We decline to recognize an exception to the Ex parte Young doctrine for actions that merely affect property owned by a Native American nation, without implicating the "particular and special circumstances," including the special sovereignty interests, at issue in Coeur d'Alene (Idaho v Coeur d'Alene Tribe of Idaho, 521 US at 287; see Muscogee [Cr.] Nation v Rollin, ___ F4th at ___, 2024 WL 4471157, *6-7, 2024 US App LEXIS 25713, *21-26; cf. Jamul Action Comm. v Simermeyer, 974 F3d at 994-995).[FN8]
For that reason, we respectfully disagree with the decision in Nahno-Lopez v Houser (627 F Supp 2d 1269, 1283 [WD Okla], affd 625 F3d 1279 [10th Cir]), and we are unpersuaded by our dissenting colleague's and the Trustee defendants' reliance upon that case [FN9]. In Nahno-Lopez v Houser, the United States District Court for the Western District of Oklahoma explained that the [*10]equitable relief requested in the complaint, if granted, would require the individual defendants to stop the trespassing that was allegedly occurring by removing fixtures and other property belonging to the Native American nation from the plaintiffs' property (see id.). The court held that this relief ran against the nation and was not permitted under an Ex parte Young theory because "even if the individual defendants were to personally go to the property and remove the offending fixtures, the fixtures are those of the [nation's] gaming facility so that it is the [nation's] property which is affected" (id.). However, as discussed above, we do not think it is sufficient for purposes of avoiding the application of Ex parte Young that the Nation's property merely be affected (see Muscogee [Cr.] Nation v Rollin, ___ F4th at ___, 2024 WL 4471157, *6-7, 2024 US App LEXIS 25713, *21-26; cf. Idaho v Coeur d'Alene Tribe of Idaho, 521 US at 287-288; Jamul Action Comm. v Simermeyer, 974 F3d at 994-995).
We also reject the Trustee defendants' contention that the Nation is the real party in interest because the Trustee defendants cannot unilaterally remove the structures and their compliance with such a direction would allegedly require authorization by the Nation. A similar argument could be made for nearly every case involving an Ex parte Young theory, as actions proceeding under this theory allow claims against a sovereign's officials in their official capacities (see e.g. National Assn. for Advancement of Colored People v Merrill, 939 F3d 470, 476 [2d Cir]; Gingras v Think Fin., Inc., 922 F3d at 121). Moreover, an action may proceed under an Ex parte Young theory even if granting the relief requested would require the officials to act in order to remedy the ongoing violation of the law (see e.g. Seneca Nation v Hochul, 58 F4th at 672 [the plaintiff was seeking to compel the defendants to obtain a valid easement for a portion of the plaintiff's reservation]; National Assn. for Advancement of Colored People v Merrill, 939 F3d at 476 [action under Ex parte Young theory against Connecticut's governor and secretary of state in their official capacities seeking a declaratory judgment and an injunction requiring them to adopt a new districting plan for future elections]; State Empls. Bargaining Agent Coalition v Rowland, 494 F3d at 98 [reinstatement of employment]; cf. Long Is. Pure Water Ltd. v Cuomo, 375 F Supp 3d 209, 217 [ED NY] [the state was the real, substantial party in interest where the majority of the relief sought would compel the plaintiff, not the defendant state officials, to act and required everything to be paid for out of the public treasury]).
Finally, we reject the Trustee defendants' contention that they cannot be directed to comply with Highway Law § 52 because it does not apply to them or the Nation. According to the amended complaint, the subject property is not part of the Reservation, and the Nation owns the subject property in fee simple. Thus, according to the amended complaint, the Trustee defendants have engaged in conduct beyond reservation boundaries, and, as such, they are subject to generally applicable state laws (see Michigan v Bay Mills Indian Community, 572 US at 795; Gingras v Think Fin., Inc., 922 F3d at 121). In support of their motion to dismiss the amended complaint insofar as asserted against them, the Trustee defendants submitted no evidence at all, let alone any evidence contradicting the allegations in the amended complaint that the Nation owns the subject property in fee simple and that the subject property is not part of the Reservation.
Accordingly, except for so much of the first and second causes of action as sought to recover monetary damages, penalties, and interest, the remainder of the amended complaint sufficiently pleaded an Ex parte Young theory against the Trustee defendants.
B. Failure to Join a Necessary Party
In the alternative, the Trustee defendants contend that their motion to dismiss the amended complaint insofar as asserted against them should have been granted because this action should not proceed in the absence of the Nation, a necessary and indispensable party that cannot be joined as a party without its consent. The plaintiffs do not dispute that the Nation is a necessary party that cannot be joined without its consent. Nonetheless, the plaintiffs contend that the Nation is not an indispensable party and that the Supreme Court providently exercised its discretion in permitting the action to proceed in the Nation's absence. We agree with the plaintiffs.
"CPLR 1001 sets forth the rules governing when joinder of parties is necessary to continue an action affecting the rights of those parties. The statute directs that persons must be brought into the action when joinder is necessary to accord 'complete relief' between the parties, or when the interests of the person might be 'inequitably affected by a judgment in the action'" (Saratoga County Chamber of Commerce v Pataki, 100 NY2d 801, 819, quoting CPLR 1001[a]).
"CPLR 1001 distinguishes between a necessary party 'subject to the jurisdiction of the court' and one over whom jurisdiction can be obtained only by consent or appearance" (Matter of Red Hook/Gowanus Chamber of Commerce v New York City Bd. of Stds. & Appeals, 5 NY3d 452, 459, quoting CPLR 1001[b]). Where, as here, a party who should be joined cannot be joined absent its consent, courts must decide whether the action can proceed without the necessary party (see id.). "Parties who must be joined lest the action be dismissed are termed 'indispensable parties'" (Saratoga County Chamber of Commerce v Pataki, 100 NY2d at 819, quoting CPLR 1001[b]).
CPLR 1001(b) provides five factors for courts to consider in determining whether a necessary party that cannot be joined absent its consent is an indispensable party:
"1. whether the plaintiff has another effective remedy in case the action is dismissed on account of the nonjoinder;
"2. the prejudice which may accrue from the nonjoinder to the defendant or to the person not joined;
"3. whether and by whom prejudice might have been avoided or may in the future be avoided;
"4. the feasibility of a protective provision by order of the court or in the judgment; and
"5. whether an effective judgment may be rendered in the absence of the person who is not joined" (see Saratoga County Chamber of Commerce v Pataki, 100 NY2d at 819-820).
Although courts must consider all five factors, no single factor is determinative, and courts have discretion in weighing the factors (see Swezey v Merrill Lynch, Pierce, Fenner & Smith, Inc., 19 NY3d 543, 551; Matter of Red Hook/Gowanus Chamber of Commerce v New York City Bd. of Stds. & Appeals, 5 NY3d at 459). "The overall statutory design is intended to (1) guarantee that absent parties at risk of prejudice will not be embarrassed by judgments purporting to bind their rights or interests where they have had no opportunity to be heard and (2) protect against multiple lawsuits and inconsistent judgments" (Swezey v Merrill Lynch, Pierce, Fenner & Smith, Inc., 19 NY3d at 551 [alteration and internal quotation marks omitted]; see Saratoga County Chamber of Commerce v Pataki, 100 NY2d at 820). Moreover, CPLR 1001(b) "treats dismissal for failure to join a necessary party as a last resort" (Matter of Red Hook/Gowanus Chamber of Commerce v New York City Bd. of Stds. & Appeals, 5 NY3d at 459).
Here, the first factor weighs in favor of the plaintiffs. The plaintiffs will not have another effective remedy if this action is dismissed on account of nonjoinder (see Swezey v Merrill Lynch, Pierce, Fenner & Smith, Inc., 19 NY3d at 551; Saratoga County Chamber of Commerce v Pataki, 100 NY2d at 820; Matter of Red Hook/Gowanus Chamber of Commerce v New York City Bd. of Stds. & Appeals, 49 AD3d 749, 752; L-3 Communications Corp. v SafeNet, Inc., 45 AD3d 1, 11; Matter of 27th St. Block Assn. v Dormitory Auth. of State of N.Y., 302 AD2d 155, 162). No party argues that this action may be commenced in another forum. Instead, the Trustee defendants contend that the plaintiffs could negotiate with the Nation as a coequal sovereign or seek appropriate legislation from Congress. However, the plaintiffs allege that they commenced this action after discussions with the Nation did not resolve the dispute, which indicates that negotiations with the Nation do not provide an effective alternative remedy for purposes of CPLR 1001(b). Moreover, we agree with the plaintiffs that the possibility of legislation from Congress is too uncertain to be considered an effective remedy for purposes of CPLR 1001(b)(1) (see generally Swezey v Merrill Lynch, Pierce, Fenner & Smith, Inc., 19 NY3d at 551 [discussing lack of "readily available remedy"]; L-3 Communications Corp. v SafeNet, Inc., 45 AD3d at 11 [even where the dismissal of an action in Maryland could be appealed within that state, the dismissal of that action nevertheless created a substantial risk that the plaintiff would be left without a remedy if the New York action [*11]were dismissed for nonjoinder])[FN10]. Thus, the lack of an effective alternative remedy strongly favors the plaintiffs (see Saratoga County Chamber of Commerce v Pataki, 100 NY2d at 820; L-3 Communications Corp. v SafeNet, Inc., 45 AD3d at 11).
We also find that the second factor favors the plaintiffs. Although this action concerns property undisputedly owned by the Nation, and the risk of prejudice to the Nation is a concern, that risk is outweighed by the presence of the Trustee defendants in this action (see L-3 Communications Corp. v SafeNet, Inc., 45 AD3d at 12; see also Kansas v United States, 249 F3d 1213, 1227 [10th Cir] [the potential for prejudice to the Native American nation was largely nonexistent due to the presence in the suit of, among others, nation officials, whose interests were substantially similar, if not identical, to the nation's interests]). Because this action is proceeding under an Ex parte Young theory, which alleges that the Trustee defendants, as Nation officials, acted in their official capacities, it would be expected that the Trustee defendants will raise any arguments that the Nation itself would have made had it chosen to participate (see Saratoga County Chamber of Commerce v Pataki, 100 NY2d at 820 [referencing appearance by amicus curiae making much the same arguments as would be expected to be made by the immune sovereign had it chosen to participate]; L-3 Communications Corp. v SafeNet, Inc., 45 AD3d at 12 [parent and subsidiary shared the exact same goal of defeating the plaintiff's legal claims]; see also Salt Riv. Project Agric. Improvement & Power Dist. v Lee, 672 F3d 1176, 1180 [9th Cir] ["there is no reason to believe the Navajo official defendants cannot or will not make any reasonable argument that the tribe would make if it were a party"]). Thus, there is every reason to believe that the Trustee defendants will adequately represent the Nation's interests in this action, thereby mitigating any prejudice resulting from the Nation's nonjoinder (see L-3 Communications Corp. v SafeNet, Inc., 45 AD3d at 12; see also Jamul Action Comm. v Simermeyer, 974 F3d at 997 [when officers of a Native American nation are properly sued in their official capacities under Ex parte Young, their interests align with those of the nation, and they may adequately represent the nation's interests]; Vann v United States Dept. of Interior, 701 F3d 927, 929 [DC Cir] ["As a practical matter, . . . the Cherokee Nation and the Principal Chief in his official capacity are one and the same in an Ex parte Young suit for declaratory and injunctive relief"]; Fitzgerald v Wildcat, 687 F Supp 3d at 784 [holding that the Native American nation council defendants, as members of the nation's governing body, could adequately represent the interests of the nation]). In addition, as the parties do not point to any other forum in which this action could be commenced, there does not appear to be any risk of prejudice to the Nation from multiple judgments (see Kansas v United States, 249 F3d at 1227; cf. Swezey v Merrill Lynch, Pierce, Fenner & Smith, Inc., 19 NY3d at 552-553).
The third factor, which focuses on whether and by whom prejudice might have been avoided, also favors the plaintiffs. In assessing this factor, courts consider the ability of the nonjoined party to intervene in the action to avoid prejudice (see Swezey v Merrill Lynch, Pierce, Fenner & Smith, Inc., 19 NY3d at 552-553; L-3 Communications Corp. v SafeNet, Inc., 45 AD3d at 13). Here, as in Saratoga County Chamber of Commerce v Pataki (100 NY2d at 820-821), the Nation has sovereign immunity and has chosen not to consent to jurisdiction. In general, "an assertion of immunity by a sovereign entity requires dismissal of an action in which it is a necessary party if the entity's claims are not frivolous and there is a potential for injury to its interests" (Swezey v Merrill Lynch, Pierce, Fenner & Smith, Inc., 19 NY3d at 553; see Republic of Philippines v Pimentel, 553 US 851, 867). Nevertheless, we do not find that general rule applicable to the [*12]circumstances of this case. The Nation is not a foreign sovereign, and this case is proceeding against the Trustee defendants under an Ex parte Young theory (cf. Republic of Philippines v Pimentel, 553 US 851 [involving the Republic of the Philippines]; Swezey v Merrill Lynch, Pierce, Fenner & Smith, Inc., 19 NY3d 543 [same]; see generally Michigan v Bay Mills Indian Community, 572 US at 795; Gingras v Think Fin., Inc., 922 F3d at 121). Thus, as in Saratoga County Chamber of Commerce v Pataki (100 NY2d at 820-821), although we "fully respect the sovereign perogative[ ]" of the Nation not to participate in this action, its voluntary absence does not require us to deprive the plaintiffs of their day in court (id. at 820).
As to the fourth factor, the Trustee defendants contend that no protective order could feasibly protect the Nation from prejudice, and the plaintiffs do not contend otherwise. Indeed, a protective order to protect the Nation's interests appears to be antithetical to the purpose of proceeding against the Trustee defendants under an Ex parte Young theory. Under those circumstances, we give the lack of a feasible protective order, which, in any event, is merely one factor to be considered under CPLR 1001(b), less weight.
Finally, as to the fifth factor, we conclude that it favors the plaintiffs. Contrary to the Trustee defendants' contention, if the plaintiffs ultimately prevail on the merits, the Supreme Court can render an effective judgment in the absence of the Nation. Because the plaintiffs are proceeding under an Ex parte Young theory against the Trustee defendants, the court may enjoin the Trustee defendants, who are Nation officials acting in their official capacity, from ongoing violations of the law (see Hutto v Finney, 437 US at 690; Edelman v Jordan, 415 US at 664; Salt Riv. Project Agric. Improvement & Power Dist. v Lee, 672 F3d at 1181). The Nation cannot act without the aid of its officials, who would be bound by the plaintiffs' requested injunction (see Salt Riv. Project Agric. Improvement & Power Dist. v Lee, 672 F3d at 1181).
Based on our balancing of the five factors in CPLR 1001(b), the Nation is not an indispensable party to this action. "Indeed, a contrary holding would effectively gut the Ex parte Young doctrine" (Salt Riv. Project Agric. Improvement & Power Dist. v Lee, 672 F3d at 1181; see Vann v United States Dept. of Interior, 701 F3d at 929). Accordingly, the Supreme Court properly denied dismissal of the amended complaint insofar as asserted against the Trustee defendants pursuant to CPLR 3211(a)(10).
III. Preliminary Injunction
We turn next to the plaintiffs' contention that the Supreme Court should have granted their motion for a preliminary injunction. In denying the motion, the court focused on the plaintiffs' contention that the Nation did not hold aboriginal title to the subject property and that the subject property was not the Nation's sovereign lands. The court concluded that the plaintiffs failed to meet their burden of establishing that they were likely to succeed on this issue because the plaintiffs primarily relied upon a vacated decision of the United States District Court for the Eastern District of New York to argue that the Nation's aboriginal title to the Westwoods had been extinguished (see New York v Shinnecock Indian Nation, 523 F Supp 2d 185, 188 [ED NY], amended 560 F Supp 2d 186 [ED NY], vacated & remanded 686 F3d 133 [hereinafter the federal court action]). The Supreme Court further noted that the Nation's ancestral domain encompassed the entirety of what is now the Town of Southampton, the Nation's presence there had been continuous, and the Nation challenged the validity and effectiveness of certain seventeenth century documents, which the State had relied upon in the federal court action to establish that the Nation's aboriginal title had been extinguished. The court also determined that the plaintiffs failed to prove irreparable injury or that a balance of equities favored them because it did not appear that the structures posed an unacceptable safety risk and the advertising revenue from the structures represented an important source of revenue to the Nation.
"To establish the right to a preliminary injunction, the plaintiff must prove by clear and convincing evidence (1) the likelihood of ultimate success on the merits, (2) irreparable injury absent the grant of the injunction, and (3) a balance of the equities in the plaintiff's favor" (Keneally, Lynch & Bak, LLP v Salvi, 190 AD3d 961, 963). "[T]he purpose of a preliminary injunction is to maintain the status quo and not to determine the ultimate rights of the parties" (Cong. Machon Chana v Machon Chana Women's Inst., Inc., 162 AD3d 635, 637; see Ying Fung Moy v Hohi Umeki, 10 AD3d 604, 604). "The existence of an issue of fact 'shall not in itself be grounds for denial of the motion'" (Stockley v Gorelik, 24 AD3d 535, 536, quoting CPLR 6312[c]).
"As a general rule, the decision to grant or deny a preliminary injunction lies within the sound discretion of the Supreme Court" (Shake Shack Fulton St. Brooklyn, LLC v Allied Prop. [*13]Group, LLC, 177 AD3d 924, 927 [internal quotation marks omitted]). Moreover, "[a]bsent unusual or compelling circumstances, appellate courts are reluctant to disturb that determination" (Cong. Machon Chana v Machon Chana Women's Inst., Inc., 162 AD3d at 637).
This case, however, presents such unusual and compelling circumstances. For the reasons that follow, we determine that the plaintiffs established their entitlement to a preliminary injunction and that the Supreme Court improvidently exercised its discretion in denying the plaintiffs' motion (see Alexandru v Pappas, 68 AD3d 690, 691; Williams v Hertzwig, 251 AD2d 655, 656).
A. Likelihood of Success on the Merits
As a threshold matter, there is no dispute that the plaintiffs' ability to establish their likelihood of success on the merits of the causes of action depends upon their ability to establish that New York State law applies to the subject property, which is part of the Westwoods and which is undisputedly owned by the Nation. To that end, the plaintiffs contend that they are likely to prevail on this issue because the Nation's aboriginal title to the Westwoods had been extinguished, the Nation reacquired ownership of the Westwoods and currently owns the Westwoods in fee simple, and as such, the Westwoods is subject to the regulatory authority of the State. The plaintiffs further contend that even if they did not establish their likelihood to prevail on the issue of extinguishment of aboriginal title, they established that they are likely to prevail on the argument that recognition of the Nation's regulatory authority over the subject property would unduly disrupt settled expectations under the doctrine announced in City of Sherrill v Oneida Indian Nation of N.Y. (544 US 197). Although we agree with the Supreme Court that the plaintiffs failed to submit sufficient evidence to establish their likelihood of success on the extinguishment of aboriginal title, we conclude that the plaintiffs established that they are likely to prevail on the argument that recognition of the Nation's ability to assert regulatory authority over the subject property for purposes of constructing, maintaining, and/or operating the structures in the highway right-of-way would be unduly disruptive to settled expectations.
1. Evidence Regarding the Nation's Title to the Westwoods
In the amended complaint, the plaintiffs alleged that the Westwoods is not part of the Reservation, the federal government does not hold the Westwoods in trust, the Westwoods is not aboriginal or sovereign land of the Nation, and the Nation owns the Westwoods in fee simple. The commercial defendants contend that the Nation holds unextinguished aboriginal title to the Westwoods. The commercial defendants also contend that if a court were to find that the Nation's aboriginal title to the Westwoods was extinguished at any point, the Westwoods qualify as "Indian country" within the meaning of 18 USC § 1151, and the State is prohibited from enforcing its regulations there.
We start by emphasizing that there is no indication in the record that the Westwoods currently has any federally recognized status. There is no indication that the Westwoods, which is geographically separate from the Reservation, is, in fact, part of the Reservation or part of any other federally recognized reservation. There is also no indication that the federal government owns the Westwoods in trust for the Nation (see 25 USC § 5108).
Moreover, we reject the commercial defendants' argument that the Westwoods qualifies as "Indian country" pursuant to 18 USC § 1151. The commercial defendants focus on subsection (b) of 18 USC § 1151, which applies to "all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state" (see Alaska v Native Village of Venetie Tribal Government, 522 US 520, 527)[FN11]. The term "dependent Indian communities" "refers to a limited category of Indian lands that are neither reservations nor allotments, and that satisfy two requirements—first, they must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence" (id.). The Westwoods appears to satisfy neither requirement (see id.). Contrary to the commercial defendants' contention, the reference to the Westwoods as "Indian Reservation" land by the Town of Southampton for tax [*14]assessment purposes does not indicate that the Westwoods was set aside by the federal government (see id.; Blunk v Arizona Dept. of Transp., 177 F3d 879, 884 [9th Cir]; see also Citizens Against Casino Gambling in Erie County v Chaudhuri, 802 F3d 267, 282 [2d Cir] ["[t]he set-aside requirement ensures that the federal government designated the land to serve the interests of an 'Indian community'"]). Likewise, a 1987 letter from the New York State Department of State stating that the Nation participates in numerous federal funding programs both directly and through the State appears to relate to the Reservation and not the Westwoods, and, in any event, would not indicate that the Westwoods is under federal superintendence (see Alaska v Native Village of Venetie Tribal Government, 522 US at 534 ["Our Indian country precedents . . . do not suggest that the mere provision of 'desperately needed' social programs can support a finding of Indian country. Such health, education, and welfare benefits are merely forms of general federal aid; . . . they are not indicia of active federal control over the Tribe's land sufficient to support a finding of federal superintendence"]). In light of this determination, we do not address the commercial defendants' contention that the State would not have jurisdiction to regulate the Westwoods if it were "Indian country" (cf. Shivwits Band of Paiute Indians v Utah, 428 F3d 966, 970, 981-983 [10th Cir] [where the land was held in trust by the federal government and there was no dispute that the land was "Indian country," analyzing whether Utah could regulate billboards by the side of a highway]).
We therefore turn to the aboriginal title contentions. "Aboriginal title refers to the [Native Americans'] exclusive right to use and occupy lands they have inhabited 'from time immemorial,' but that have subsequently become 'discovered' by European settlers" (Seneca Nation of Indians v New York, 382 F3d 245, 248 n 4 [2d Cir], quoting County of Oneida v Oneida Indian Nation of N.Y., 470 US 226, 234). "Under the doctrine of discovery, European nations that discovered lands in North America held fee title to those lands, subject to the inhabiting [Native Americans'] aboriginal right of occupancy and use" (id.; see County of Oneida v Oneida Indian Nation of N.Y., 470 US at 234). Nevertheless, aboriginal title was not inviolable, and it could be "extinguished" by the sovereign "discoverer" through a taking by war, physical dispossession, contract, or treaty (Seneca Nation of Indians v New York, 382 F3d at 248 n 4 [internal quotation marks omitted]; see Oneida Indian Nation of N.Y. v New York, 860 F2d 1145, 1150 [2d Cir]).
"Typically, extinguishment resulted in the joining of the possessory and ownership rights to the land in fee simple in the sovereign, but where the fee title was devised by the sovereign prior to extinguishment of aboriginal title, the devisee held the 'right of preemption,' which was the exclusive, alienable right to acquire fee title to Indian land upon extinguishment" (Seneca Nation of Indians v New York, 382 F3d at 248 n 4).
Since the adoption of the federal Constitution, the federal government has had the right of extinguishment (see Oneida Indian Nation of N.Y. v New York, 860 F2d at 1150). Once aboriginal title in property has been extinguished, it cannot be revived, even if the Native American nation subsequently reacquires the land (see Cass County v Leech Lake Band of Chippewa Indians, 524 US 103, 115; Delaware Nation v Pennsylvania, 2004 WL 2755545, *10, 2004 US Dist LEXIS 24178, *34 [ED Pa, No. Civ.A. 04-CV-166], affd on other grounds 446 F3d 410 [3d Cir]; Tuscarora Nation of Indians v Power Auth. of State of N.Y., 164 F Supp 107, 113 [WD NY]; State v Elliott, 159 Vt 102, 107, 616 A2d 210, 213).
After a 30-day nonjury trial in the federal court action, which included more than 20 witnesses and more than 600 exhibits, the Eastern District of New York determined that the evidence "overwhelmingly demonstrated" that aboriginal title held by the Nation to the Westwoods was extinguished in the seventeenth century when the Nation sold the land to non—Native Americans, and further determined that the absence of current aboriginal title to the Westwoods rendered that land subject to the application of New York State law on the development of a casino (New York v Shinnecock Indian Nation, 523 F Supp 2d at 188). Although the plaintiffs correctly acknowledge that the Eastern District of New York's decision was vacated by the Second Circuit for lack of subject matter jurisdiction (see New York v Shinnecock Indian Nation, 686 F3d at 141), they contend, in effect, that the fact that they previously prevailed on the issue demonstrates that they are likely to prevail again.
However, this argument is fundamentally flawed. "A judgment rendered by a court [*15]without subject matter jurisdiction is void as a matter of law" (Caffrey v North Arrow Abstract & Settlement Servs., Inc., 160 AD3d 121, 129). "The want of jurisdiction makes the order and judgment of the court, and the record of its action utterly void and unavailable for any purpose" (Kamp v Kamp, 59 NY 212, 216 [emphasis added]). Although the plaintiffs could have submitted some or all of the evidence that the State relied upon in the federal court action to support the contention that the Nation's aboriginal title to the Westwoods had been extinguished, the plaintiffs chose not to do so [FN12]. Accordingly, the plaintiffs' submissions were insufficient to meet their burden of establishing a likelihood of success on the issue of whether the Nation's aboriginal title to the Westwoods had been extinguished.
2. The State's Right-of-Way and Settled Expectations
Nevertheless, that does not end our analysis. The plaintiffs contend that even if they failed to establish that the Nation's aboriginal title to the Westwoods had been extinguished, they established that they were likely to prevail on the merits by demonstrating that recognition of the Nation's regulatory authority over the Westwoods would be too disruptive to settled expectations and would not be permitted under the doctrine of City of Sherrill v Oneida Indian Nation of N.Y. (544 US 197). They contend that if the Nation's claim of sovereignty over the Westwoods were accepted, it would divest the State of its regulatory authority over the highway and open the door to further obstructions in the right-of-way or even complete closure of the portion of the highway that runs through the Nation's land. By contrast, the commercial defendants, citing the Supreme Court's decision in the order appealed from, emphasize that this case, unlike City of Sherrill v Oneida Indian Nation of N.Y., did not involve a "wildly-belated 'land grab,'" as it is undisputed that the Nation owned the Westwoods for centuries. They further contend that the structures would not have the same disruptive consequences as the casino project at issue in the federal court action. We now address these contentions.[FN13]
In City of Sherrill v Oneida Indian Nation of N.Y., the United States Supreme Court relied upon the doctrines of laches, acquiescence, and impossibility to bar a claim by the Oneida Indian Nation of New York (hereinafter the Oneida Nation) that its repurchase in 1997 and 1998 of certain property, which had once been part of its aboriginal reservation lands but which it had not possessed since 1805, resulted in the reassertion of the Oneida Nation's sovereign authority over that property for purposes of avoiding municipal real property taxes (see id. at 202-203, 214, 220; Cayuga Indian Nation of N.Y. v Gould, 14 NY3d at 640; Stockbridge-Munsee Community v New York, 756 F3d 163, 165 [2d Cir]). The Court emphasized that a parcel-by-parcel revival of the Oneida Nation's sovereign authority would create, unilaterally at the Oneida Nation's behest, "[a] checkerboard of alternating state and tribal jurisdiction in New York" that would "seriously burden the administration of state and local governments and would adversely affect landowners neighboring the tribal patches" (City of Sherrill v Oneida Indian Nation of N.Y., 544 US at 219-220 [alteration and internal quotation marks omitted]; see Cayuga Indian Nation of N.Y. v Gould, 14 [*16]NY3d at 640). The Court further stated that if the Oneida Nation "may unilaterally reassert sovereign control and remove these parcels from the local tax rolls, little would prevent the [Oneida Nation] from initiating a new generation of litigation to free the parcels from local zoning or other regulatory controls that protect all landowners in the area" (City of Sherrill v Oneida Indian Nation of N.Y., 544 US at 220).
Since City of Sherrill v Oneida Indian Nation of N.Y., courts have relied upon that doctrine to bar disruptive land claims by Native American nations (see e.g. Oneida Indian Nation of N.Y. v County of Oneida, 617 F3d 114 [2d Cir]; Cayuga Indian Nation of N.Y. v Pataki, 413 F3d 266, 277 [2d Cir]).
"Although we recognize that the Supreme Court did not identify a formal standard for assessing when these equitable defenses apply, the broadness of the Supreme Court's statements indicates to us that Sherrill's holding is not narrowly limited to claims identical to that brought by the [Oneida Nation], seeking a revival of sovereignty, but rather, that these equitable defenses apply to 'disruptive' [Native American] land claims more generally" (Cayuga Indian Nation of N.Y. v Pataki, 413 F3d at 274).
In our view, the plaintiffs are likely to succeed on their argument that this case presents the type of disruptive land claim that would be barred under the doctrine of City of Sherrill v Oneida Indian Nation of N.Y. The record demonstrates that in 1959, the State acquired a permanent easement for highway purposes over the subject property from the Nation, and, since then, the State constructed, maintained, and operated the highway, which runs through the subject property. There is no indication in the record that in the decades between 1959 and 2019, there was any challenge to the validity of the State's easement or the State's ability to regulate within the highway right-of-way [FN14]. Although this approximately 60-year period may not be as long as the lengths of time at issue in other cases, the critical issue is the disruptiveness of the claim, not necessarily the length of time involved (see City of Sherrill v Oneida Indian Nation of N.Y., 544 US at 202; Cayuga Indian Nation of N.Y. v Pataki, 413 F3d at 277). In other words, the length of time is a factor that should be considered in determining how disruptive a claim is, but it is not necessarily dispositive of the issue (see Cayuga Indian Nation of N.Y. v Pataki, 413 F3d at 277; see also Galliher v Cadwell, 145 US 368, 373 ["laches is not . . . a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced,—an inequity founded upon some change in the condition or relations of the property or the parties"]).
Similarly, it is not dispositive that this case does not raise, in the words of the Supreme Court, "the specter of a wildly-belated 'land grab'" because "there is no doubt that the Nation has owned [the subject property] for many decades, if not centuries, predating most, if not all, significant development in the area." Even assuming that the Nation has owned the subject property for centuries, the critical issue in this case is the disruptiveness of taking away the State's power to regulate the subject property, which from at least 1959 appeared settled (see City of Sherrill v Oneida Indian Nation of N.Y., 544 US at 214; Shinnecock Indian Nation v New York, 2006 WL 3501099, *5, 2006 US Dist LEXIS 87516, *17-18 [ED NY, No. 05-CV-2887 (TCP)] [in another dispute between the Nation and the State involving different property in Suffolk County, holding that the test for disruptiveness is not based on strict numeric calculations of the acres of land involved], affd 628 Fed Appx 54 [2d Cir]).
Here, a recognition of the Nation's ability to assert sovereign power over the subject property for purposes of constructing, maintaining, and/or operating the structures in the highway right-of-way would likely be highly disruptive of settled expectations (see City of Sherrill v Oneida Indian Nation of N.Y., 544 US at 202; Shinnecock Indian Nation v New York, 2006 WL 3501099, *5, 2006 US Dist LEXIS 87516, *17-18 [holding that the Nation's claim was disruptive where it sought the immediate ejectment of a number of defendants, given the drastically changed conditions in the subject lands]; cf. Cayuga Indian Nation of N.Y. v Gould, 14 NY3d at 641 [the Cayuga Indian Nation did not suggest that its reacquisition of the parcels revived its ability to exert full sovereign authority over the property; rather than seeking immunity from state tax laws, it was actually relying upon state tax laws to contend that under the plain language of those laws, those laws did not apply to them]). If avoiding property tax is disruptive (see City of Sherrill v Oneida Indian Nation of N.Y., 544 US at 220), then avoiding compliance with state laws that prevent the construction of structures in a highway right-of-way without undergoing the appropriate safety review is even more disruptive (see Cayuga Indian Nation of N.Y. v Village of Union Springs, 390 F Supp 2d 203, 206 [ND NY] ["If avoidance of taxation is disruptive, avoidance of complying with local zoning and land use laws is no less disruptive. In fact, it is even more disruptive"]; see also Seneca-Cayuga Tribe of Okla. v Town of Aurelius, 233 FRD 278, 282 [ND NY]). Moreover, to the extent the commercial defendants contend that the structures are being constructed in compliance with safety standards of the Nation's own choosing, that argument does not persuade us. There is no indication that the highway has previously been subject to such a "checkerboard" of regulation (City of Sherrill v Oneida Indian Nation of N.Y., 544 US at 219; cf. Red Cliff Band of Lake Superior Chippewa Indians v Bayfield County, 432 F Supp 3d 889, 898 [WD Wis] [rejecting application of City of Sherrill where, among other reasons, there would still be a "'checkerboard'" arrangement with respect to zoning by the federal, municipal, and Native American nation's governments, regardless of the outcome of the case]). Contrary to the opinion of our dissenting colleague, these considerations by themselves lead us to the conclusion that this action likely does present a highly disruptive land claim (see City of Sherrill v Oneida Indian Nation of N.Y., 544 US at 220).
Moreover, although our dissenting colleague concludes that such concerns are "pure speculation," we also may consider the potential future consequences of the land claim at issue, as the United States Supreme Court did in City of Sherrill v Oneida Indian Nation of N.Y. (see id. [discussing the potential harmful consequences that could result in the future if the Oneida Nation's claim of sovereignty over the land was recognized, including the potential of future litigation to free the land of local zoning and other regulatory control]). If the Nation is permitted to assert sovereign authority over the subject property for purposes of these structures, little would prevent the Nation from asserting full sovereign authority over the subject property or even requiring that the portion of the highway that goes through the subject property be rerouted (see id.; Canadian St. Regis Band of Mohawk Indians v New York, 2013 WL 3992830, *5, 2013 US Dist LEXIS 94381, *23 [ND NY, Nos. 5:82-CV-0783, 5:82-CV-1114, 5:89-CV-0829 (LEK/TWD)] ["Ejecting the state or otherwise requiring that the highway be rerouted at this late date would be highly disruptive"]). In addition to the likely great expense involved, rerouting the highway would likely "have devastating consequences to the region's economy and a drastic impact on thousands of commuters" (Shinnecock Indian Nation v New York, 2006 WL 3501099, *5 n 9, 2006 US Dist LEXIS 87516, *18 n 9 [noting disruptive consequences of ejecting the Long Island Rail Road from different land claimed by the Nation in Suffolk County]; see Cayuga Indian Nation of N.Y. v Cuomo, 1999 WL 509442, *29, 1999 US Dist LEXIS 10579, *98 [ND NY, Nos. 80-CV-930, 80-CV-960] [rerouting the New York State Thruway "would have almost unthinkable consequences in terms of intrastate and interstate commerce"]).
In sum, we determine that for the purpose of their motion for a preliminary injunction, the plaintiffs sufficiently demonstrated that New York State law is likely to apply to the subject property.
3. Remaining Contentions Regarding Likelihood of Success on the Merits
The commercial defendants additionally contend that even if the State does have regulatory authority over the subject property, the plaintiffs are unlikely to succeed on the merits of the causes of action because the 1959 easement is invalid. The commercial defendants further contend that even if the easement had been validly taken, the State's rights under the easement are [*17]limited and the subject property does not meet the definition of "highway right of way" in Highway Law § 52. These contentions do not defeat the plaintiffs' showing of likelihood of success on the merits.
Although the commercial defendants contend in connection with this case that the 1959 easement was taken unlawfully, there is no indication that the commercial defendants have any legally recognized right to contest the validity of the easement or the extent of the rights granted to the State thereunder (see Matter of Huie, 22 Misc 2d 1028, 1034 [Sup Ct, Ulster County] ["The extent of the use of the easement might be an issue between the parties to an easement, but such use may not be contested by a person not a party to the easement"]). At least as of the record before the Supreme Court on the plaintiffs' motion, the Trustee defendants themselves did not challenge the validity of the easement. Moreover, the plaintiffs established a likelihood of success on the merits on the cause of action for removal of obstructions and encroachments pursuant to RPAPL 871, as the record indicated that the State had an easement over the subject property and the structures interfered with that easement (see Camp Bearberry, LLC v Khanna, 212 AD3d 897, 898-899; 91-54 Gold Rd., LLC v Cross-Deegan Realty Corp., 93 AD3d 649, 650; Bailey v Ossi Sport Club, Inc., 71 AD3d 1069, 1070).
To the extent that the commercial defendants contend that the plaintiffs are unable to demonstrate a likelihood of success on the merits on the Highway Law § 52 cause of action because the 1959 easement does not constitute a "state highway right of way" within the definition of Highway Law § 52, that contention is without merit. The State was granted a permanent easement over the subject property "for the purpose of constructing, reconstructing and maintaining thereon a highway and highway structures, together with appurtenances." Highway Law § 52 defines "state highway right of way" as
"the entire width between the boundary line of all property which has been purchased or appropriated by the state for state highway purposes, all property over which the commissioner of transportation or his [or her] predecessors has assumed jurisdiction for state highway purposes, all property over which the commissioner of transportation has assumed jurisdiction during the period of construction, reconstruction or improvement and all property which has become part of the state highway system through dedication or use."
The State's easement over the subject property qualifies as a "highway right of way" under the plain meaning of that definition (see generally State of New York v Patricia II, 6 NY3d 160, 162 [where the language of a statute is clear and unambiguous, courts must give effect to its plain meaning]). As it is undisputed that no permit was obtained for the construction of the structures, which are located in the highway right-of-way, the plaintiffs established a likelihood of success on the merits on the cause of action premised upon a violation of Highway Law § 52.
We emphasize that the plaintiffs were not required to establish the merits of all the causes of action with certainty (see Ying Fung Moy v Hohi Umeki, 10 AD3d at 605 ["conclusive proof is not required"]; Incorporated Vil. of Babylon v Anthony's Water Cafe, 137 AD2d 791, 792 ["it is clear that the showing of a likelihood of success on the merits required before a preliminary injunction may be properly issued must not be equated with the showing of a certainty of success" (emphasis and internal quotation marks omitted)]). Instead, to obtain a preliminary injunction, the plaintiffs only had to establish by clear and convincing evidence their likelihood of success on the merits on one cause of action that would entitle them to have the relief sought in the preliminary injunction. They met that burden.
B. Irreparable Injury to the Plaintiffs
In support of their motion, the plaintiffs argued that they would suffer irreparable injury in the absence of an injunction from the defendants' construction of 60-foot structures with electronic displays within the highway right-of-way. The plaintiffs argued that the defendants had not provided them with sufficient materials for them to review the safety of the structures. However, according to the plaintiffs, from the materials that had been provided, the structures posed dangers to the public traveling on the highway, including from the use of LED displays and the size and proximity of the structures to the highway.
In opposing the plaintiffs' motion, the commercial defendants did not submit any [*18]evidence addressed to the plaintiffs' safety concerns or the alleged integrity of the structures [FN15]. Instead, the commercial defendants argued that they and the Nation would suffer irreparable harm from the loss of advertising revenue from the structures. Although these arguments are relevant to the balance of equities and will be discussed below, the alleged harm to the defendants is not relevant to whether the plaintiffs have suffered irreparable harm.
We determine that the plaintiffs met their burden of establishing the danger of an irreparable injury absent the grant of a preliminary injunction (see Kraemer v T.C.R. Servs., 93 AD2d 808, 809). In his affidavit in support of the plaintiffs' motion, Vijayendran, the professional engineer, averred that
"[w]ork performed on or near a public highway without first being reviewed through a permitting process is inherently dangerous because it does not allow the [DOT] to review: (1) impacts on the existing highway, including drainage, structural integrity, and sightline issues; (2) impacts on the traveling public during the conduct of the work . . . ; [and] (3) impacts on the traveling public after completion of the work, including traffic volumes and safety issues."
Vijayendran averred that the "proposed advertising signs" would violate 17 NYCRR 150.6, which provides that the "maximum area for any one sign shall be 1200 square feet, with a maximum height of 30 feet and a maximum length of 60 feet" (id. § 150.6[a]). In addition, he averred that the structures would violate 17 NYCRR 150.4 and 150.8, which prohibit signs with animated or moving parts and signs with illuminated or flashing lights with certain exceptions not applicable to the center displays, respectively. He also averred that "[b]ecause [the plaintiffs] have not been provided plans, the [DOT] has no way of evaluating the level of illumination planned for the signs." Nonetheless, he averred that based on representations made by the Nation and the commercial defendants, the DOT was "unfortunately confident that the signs will violate New York regulations barring road signs with illumination or moving elements in non-commercial zones and it is likely that the signs will be equivalent to similar electronic billboards found in commercial zones in New York City." Vijayendran also averred that due to excavation and other landscaping performed by the defendants, the construction of the structures changed the drainage capabilities previously designed by the DOT, and as the plans were not provided to the DOT, it could not be sure of the degree of impact, nor mitigate against the impact. He further averred that after construction, "the signs and their associated impact on highway drainage will present an on-going risk that [the highway] may become impassable."
Contrary to the Supreme Court's determination, we find that the plaintiffs' submissions were sufficient to establish for the purpose of a preliminary injunction that the structures posed an unacceptable danger to public safety. The regulations concerning the displays on billboards aim to protect the traveling public, and Vijayendran averred that "the proposed advertising signs will present an on-going hazard to the traveling public, who will be distracted by the illuminated lights and may swerve as a result" (see Suffolk Outdoor Adv. Co. v Hulse, 43 NY2d 483, 488 [ordinance permitting the removal of nonconforming billboards was reasonably related to public safety and welfare]; New York State Thruway Auth. v Ashley Motor Ct., 10 NY2d 151, 156 [legislation regarding billboards adjacent to the New York State Thruway was aimed at rendering the Thruway safe for the traveling public by providing for maximum visibility and by preventing unreasonable distractions], amended 10 NY2d 886; RHP, Inc. v City of Ithaca, 91 AD2d 721, 721 [municipal regulation of outdoor advertising for aesthetic and safety purposes constituted a valid exercise of police power]; cf. Shivwits Band of Paiute Indians v Utah, 428 F3d at 983 [holding that Utah did not have a substantial interest in regulating billboards that were located on land held by the federal government in trust for the Native American nation where, among other things, Utah's relevant regulations were virtually identical to the relevant federal regulations and the federal government had [*19]expressly authorized the billboards at issue]). Moreover, Vijayendran averred that given that the structures are more than 60 feet tall, if they were to fall across the highway, they would likely block the highway, damage the highway, and endanger the traveling public (see Central Park Sightseeing LLC v New Yorkers for Clean, Livable & Safe Sts., Inc., 157 AD3d 28, 33).
Nor are we persuaded by the Supreme Court's conclusion that it appeared that the structures were not "constructed and operated without regard to accepted engineering standards." Although the plaintiffs submitted engineering plans that were allegedly provided to them by the defendants, Vijayendran averred that even considering these submissions, the DOT could not "conduct a meaningful review of the piecemeal information" submitted by the Nation and the commercial defendants, "meaning that it is difficult to determine if the unauthorized advertising signs are safe as designed or built" and that the DOT did not "know the full scope" of the planned construction. Thus, these materials did not satisfy Vijayendran that the structures were safe or that they appeared to be constructed according to accepted engineering standards. As the commercial defendants submitted no evidence at all addressed to the engineering of the structures or the plaintiffs' safety concerns, there was nothing in the record to contradict Vijayendran's averments (see generally Koehler v Town of Smithtown, 280 AD2d 648, 648-649 ["In opposition to the plaintiffs' motion, the appellants were totally unprepared for a hearing on the motion and failed to adduce any evidence rebutting that proffered by the plaintiffs"]). Moreover, to the extent that the court relied upon unsubstantiated assertions made by the attorneys for the defendants at oral argument regarding the safety of the structures, it should not have done so (see 106 Spring St. Owner LLC v Workspace, Inc., 166 AD3d 503, 504).
C. Balance of Equities
Finally, we must determine whether the plaintiffs established that a balance of equities was in their favor. As described above, the plaintiffs established that the structures posed an unacceptable danger to public safety. In opposing the plaintiffs' motion, the commercial defendants focused upon the financial harm that they and the Nation would suffer as a result of the loss of advertising revenue from the structures. Clark, one of the commercial defendants and a managing member of Iconic Digital Displays, LLC (hereinafter Iconic), averred in an affidavit that Iconic had spent approximately $2.2 million on the project to construct the structures, a bank financing the project had placed its $3.3 million financing on hold, Iconic had lost approximately $1 million in potential advertising revenue, and Iconic would suffer damage to its reputation in the advertising and outdoor display industries. In addition, the commercial defendants submitted the affidavit from Troge, a member of the Nation and an attorney who had represented the Nation at oral argument on the plaintiffs' request for a temporary restraining order. Among other things, attached to Troge's affidavit were printouts from the United States Census Bureau website showing that in the year 2000, 61.3% of the Nation's families lived below the poverty line.
Regarding the commercial defendants, we agree with the plaintiffs that the risk of any loss of advertising revenue and reputational concerns results from a situation largely of the commercial defendants' own making. The commercial defendants knew that no permit was obtained from the State in connection with the structures and chose to proceed anyway. Although Clark averred that he relied upon the Nation's ownership of the subject property, based upon prior litigation between the Nation and the State concerning land in Suffolk County, including the Westwoods (see New York v Shinnecock Indian Nation, 686 F3d 133; Shinnecock Indian Nation v New York, 2006 WL 3501099, 2006 US Dist LEXIS 87516), he also had every reason to believe that the State would take the position that it had regulatory authority over the subject property and that litigation, with its attendant risks, would ensue. It appears that the commercial defendants took a calculated risk to proceed anyway.
Regarding the commercial defendants' assertions of harm caused to the Nation by the loss of advertising revenue, those assertions are largely unsubstantiated, as the Trustee defendants did not submit written opposition or any evidence in opposition to the plaintiffs' motion (see Kurzban & Son v Board of Educ. of City of N.Y., 129 AD2d 756, 757; see also Koehler v Town of Smithtown, 280 AD2d at 649). Although the printouts from the United States Census Bureau website attached to Troge's affidavit established the high levels of poverty among members of the Nation, neither these submissions nor any submissions from the commercial defendants indicated how the advertising revenue will help alleviate that poverty. In particular, there is nothing in the record to support the assertion made by Troge at oral argument while she was representing the [*20]Nation on the plaintiffs' request for a temporary restraining order that the Nation will use the projected revenue from the structures for social programs (see Kurzban & Son v Board of Educ. of City of N.Y., 129 AD2d at 757).
Thus, balancing the risk of financial harm to the defendants with the danger to public safety posed by their conduct, we conclude that the balance of equities favors the plaintiffs (see Welcher v Sobol, 222 AD2d 1001, 1003; People v New York State Fedn. of Police, 188 AD2d 689, 691). Accordingly, the Supreme Court should have granted the plaintiffs' motion for a preliminary injunction enjoining the defendants from constructing, operating, and maintaining the structures during the pendency of this action.
IV. Conclusion
The Trustee defendants may be sued in New York State courts in their official capacities to enjoin their off-reservation, ongoing violations of New York State law under a theory analogous to the theory announced in Ex parte Young (209 US 123). With the exception of so much of the first and second causes of action as sought monetary damages, penalties, and interest insofar as asserted against the Trustee defendants, the amended complaint sufficiently pleads an Ex parte Young theory against the Trustee defendants. Further, based on our balancing of the five factors in CPLR 1001(b), the Nation is not an indispensable party to this action. Accordingly, the Supreme Court should have granted those branches of the Trustee defendants' motion which were to dismiss so much of the first and second causes of action as sought monetary damages, penalties, and interest insofar as asserted against them, but properly denied the remaining branches of the Trustee defendants' motion to dismiss the amended complaint insofar as asserted against them.
Regarding the plaintiffs' motion for a preliminary injunction, the plaintiffs are likely to succeed on their argument that this case presents the type of disruptive land claim that would be barred under the doctrine of City of Sherrill v Oneida Indian Nation of N.Y. (544 US 197) and, therefore, New York law likely applies to the subject property, and they are likely to succeed on the merits. The plaintiffs' submissions established the danger of irreparable injury to the plaintiffs absent a preliminary injunction and the balance of equities favored them. Accordingly, the Supreme Court should have granted the plaintiffs' motion for a preliminary injunction.
Accordingly, the order is modified, on the law, (1) by deleting the provision thereof denying those branches of the Trustee defendants' motion which were pursuant to CPLR 3211(a) to dismiss so much of the first and second causes of action as sought monetary damages, penalties, and interest insofar as asserted against them, and substituting therefor a provision granting those branches of the motion, and (2) by deleting the provision thereof denying the plaintiffs' motion for a preliminary injunction enjoining the defendants from constructing, operating, and maintaining the subject structures during the pendency of this action, and substituting therefor a provision granting the motion; as so modified, the order is affirmed insofar as appealed from.
MALTESE and WARHIT, JJ., concur.
ORDERED that the order is modified, on the law, (1) by deleting the provision thereof denying those branches of the motion of the defendants Bryan A. Polite, Launcelot A. Gumbs, Seneca Bowen, Daniel Collins, Sr., Germain Smith, Donald Williams, Jr., and Linda Franklin which were pursuant to CPLR 3211(a) to dismiss so much of the first and second causes of action as sought monetary damages, penalties, and interest insofar as asserted against them, and substituting therefor a provision granting those branches of the motion, and (2) by deleting the provision thereof denying the plaintiffs' motion for a preliminary injunction enjoining the defendants from constructing, operating, and maintaining the subject structures during the pendency of this action, and substituting therefor a provision granting the motion; as so modified, the order is affirmed insofar as appealed from, without costs or disbursements.
DOWLING, J., concurs in part and dissents in part, and votes to reverse the order insofar as appealed from, on the law, grant the motion of the defendants Bryan A. Polite, Launcelot A. Gumbs, Seneca Bowen, Daniel Collins, Sr., Germain Smith, Donald Williams, Jr., and Linda Franklin pursuant to CPLR 3211(a) to dismiss the amended complaint insofar as asserted against them, and affirm the order insofar as cross-appealed from, with the following memorandum:
In this action, the plaintiffs, Commissioner of the New York State Department of Transportation and State of New York, seek to use State courts to prevent members of the Council of Trustees of the Shinnecock Indian Nation (hereinafter the Shinnecock Nation) from erecting Shinnecock Nation structures on Shinnecock Nation property adjoining Sunrise Highway in alleged [*21]violation of State law. In my opinion, the plaintiffs should not be permitted to do so. Therefore, respectfully, I dissent, in part.
As stated by the majority, the Shinnecock Nation owns land known as the Westwoods located within the boundaries of the Town of Southampton in Suffolk County. The Westwoods is disputedly ancestral lands of the Shinnecock Nation that is not part of the Shinnecock Reservation, but rather is held by the Shinnecock Nation in fee simple. In 1959, the State allegedly acquired a permanent highway easement over an approximately 3.62-acre area of the Westwoods to construct a portion of Sunrise Highway, also known as State Route 27. The structures, or fixtures, that are the subject of this action are owned by the Shinnecock Nation and were or are being constructed next to Sunrise Highway over an unimproved portion of the Westwoods technically located within the State's right-of-way. The State complains that the structures were constructed in violation of State law and without proper permits.
The Shinnecock Nation is a federally recognized Native American nation with tribal sovereign immunity. As has been often repeated, Native American nations are "'separate sovereigns pre-existing the Constitution'" (Michigan v Bay Mills Indian Community, 572 US 782, 788, quoting Santa Clara Pueblo v Martinez, 436 US 49, 56). "Among the core aspects of sovereignty" that Native American nations possess "is the 'common law immunity from suit traditionally enjoyed by sovereign powers'" (id., quoting Santa Clara Pueblo v Martinez, 436 US at 58).
"[T]ribal immunity 'is a matter of federal law and is not subject to diminution by the States'" (id. at 789, quoting Kiowa Tribe of Okla. v Manufacturing Technologies, Inc., 523 US 751, 756; see Blatchford v Native Village of Noatak, 501 US 775, 782; Washington v Confederated Tribes of Colville Reservation, 447 US 134, 154 ["tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States"]). "Absent an effective waiver or consent, it is settled that a state court may not exercise jurisdiction over a recognized Indian tribe" (Puyallup Tribe, Inc. v Department of Game of Wash., 433 US 165, 172; see Michigan v Bay Mills Indian Community, 572 US at 788-789; Matter of Ransom v St. Regis Mohawk Educ. & Community Fund, 86 NY2d 553, 558-559; Zeth v Johnson, 309 AD2d 1247), regardless of where the tribal activities occurred (see Kiowa Tribe of Okla. v Manufacturing Technologies, Inc., 523 US at 754). "[T]ribal immunity applies no less to suits brought by States (including in their own courts) than to those by individuals" (Michigan v Bay Mills Indian Community, 572 US at 789). "To abrogate tribal immunity, Congress must 'unequivocally' express that purpose" (C & L Enterprises, Inc. v Citizen Band Potawatomi Tribe of Okla., 532 US 411, 418, quoting Santa Clara Pueblo v Martinez, 436 US at 58).
The Shinnecock Nation is not named as a defendant in this action. Instead, the amended complaint names individual members of the Council of Trustees of the Shinnecock Nation (hereinafter the Shinnecock Nation Trustees) as defendants, sued in their official capacities. A Native American nation's sovereign immunity extends to its officials acting in their official capacities and within the scope of their authority, including for actions undertaken off-reservation, and a plaintiff may not circumvent a Native American nation's sovereign immunity by nominally suing its officials (see Lewis v Clarke, 581 US 155, 163 ["Defendants in an official-capacity action may assert sovereign immunity"]; Cook v Avi Casino Enters., Inc., 548 F3d 718, 727 [9th Cir] ["Tribal sovereign immunity extends to tribal officials when acting in their official capacity and within the scope of their authority" (internal quotation marks omitted)]; Native Am. Distrib. v Seneca-Cayuga Tobacco Co., 546 F3d 1288, 1296 [10th Cir]; Catskill Dev., L.L.C. v Park Place Entertainment Corp., 206 FRD 78, 86 [SD NY]). "In these cases the sovereign entity is the 'real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants'" (Cook v Avi Casino Enters., Inc., 548 F3d at 727, quoting Regents of Univ. of Cal. v Doe, 519 US 425, 429; see Lewis v Clarke, 581 US at 162; Kentucky v Graham, 473 US 159, 165 ["Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent" (internal quotation marks omitted)]; Monell v New York City Dept. of Social Servs., 436 US 658, 690 n 55). Of course, a state may commence an action against Native American nation officials in their individual capacities to enjoin or punish the individual's off-reservation violations of state law (see Lewis v Clarke, 581 US at 162; Puyallup Tribe, Inc. v Department of Game of Wash., 433 US at 171-172; Mescalero Apache Tribe v Jones, 411 US 145, 148-149; Organized Village of Kake v Egan, 369 US 60, 75; Maxwell v County of San Diego, 708 F3d 1075, 1088 [9th Cir]; see also Nevada v Hicks, 533 US 353). Here, however, the Shinnecock Nation Trustees are named in their official capacities for acts undertaken within the scope of their authority. As such, the Shinnecock Nation Trustees are entitled to invoke [*22]the Shinnecock Nation's sovereign immunity as a defense to this action (see Regents of Univ. of Cal. v Doe, 519 US at 429; Kentucky v Graham, 473 US at 167; Cook v Avi Casino Enters., Inc., 548 F3d at 727).
The majority, relying on Ex parte Young (209 US 123), nevertheless concludes that this action may proceed against the Shinnecock Nation Trustees to the extent the State seeks prospective injunctive relief for off-reservation violations of State law. In my view, the majority's application of Ex parte Young to this case authorizes an impermissible exception to Native American nation sovereign immunity which I cannot support.
The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State" (US Const Amend XI). "Despite the narrowness of its terms" (Blatchford v Native Village of Noatak, 501 US at 779), the Eleventh Amendment is understood to "confirm the structural understanding that States entered the Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant" (Virginia Office for Protection and Advocacy v Stewart, 563 US 247, 253; see Blatchford v Native Village of Noatak, 501 US at 779).
In Ex parte Young (209 US 123), the Supreme Court established a "limited exception" (Western Mohegan Tribe & Nation v Orange County, 395 F3d 18, 21 [2d Cir]) to the Eleventh Amendment's bar against suing a state by holding that private litigants could seek an injunction in federal court against a state official to prohibit that official from enforcing a state law claimed to violate the federal Constitution (see Ex parte Young, 209 US at 159-168). In that case, the Minnesota Attorney General commenced a habeas corpus proceeding in the Supreme Court after being committed to federal prison for violating a federal injunction prohibiting him from enforcing an unconstitutional state statute imposing certain railroad rates. The Supreme Court explained that, because an unconstitutional legislative enactment is "void," a state official who enforces that law "comes into conflict with the superior authority of [the] Constitution" and is thus "stripped of his [or her] official or representative character and is subjected in his [or her] person to the consequences of his [or her] individual conduct. The state has no power to impart to him [or her] any immunity from responsibility to the supreme authority of the United States" (id. at 159-160).
The doctrine proscribed by Ex parte Young "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he [or she] is not the State for sovereign-immunity purposes" (Virginia Office for Protection and Advocacy v Stewart, 563 US at 255 [citation omitted], quoting Pennhurst State School and Hospital v Halderman, 465 US 89, 114 n 25; accord Seneca Nation v Cuomo, 484 F Supp 3d 65, 73 [WD NY], affd sub nom. Seneca Nation v Hochul, 58 F4th 664 [2d Cir]). "The doctrine is limited to that precise situation, and does not apply 'when the state is the real, substantial party in interest'" (Virginia Office for Protection and Advocacy v Stewart, 563 US at 255, quoting Pennhurst State School and Hospital v Halderman, 465 US at 101 [internal quotation marks omitted]). The Supreme Court has cautioned that "[a]pplication of the Young exception must reflect a proper understanding of its role in our federal system and respect for state courts instead of a reflexive reliance on an obvious fiction" (Idaho v Coeur d'Alene Tribe of Idaho, 521 US 261, 270). "The purpose of this exception is to 'ensure that the doctrine of sovereign immunity remains meaningful, while also giving recognition to the need to prevent violations of federal law'" (In re Dairy Mart Convenience Stores, Inc., 411 F3d 367, 377 [2d Cir], quoting Idaho v Coeur d'Alene Tribe of Idaho, 521 US at 269; see Green v Mansour, 474 US 64, 68 [the Ex parte Young exception "gives life to the Supremacy Clause"]).
In my opinion, Ex parte Young does not permit state actions against Native American nation officials to enjoin a Native American nation's alleged violation of state law. Such an application does not implicate "the supreme authority of the United States" (Ex parte Young, 209 US at 160) or "recognition [of] the need to prevent violations of federal law" (Idaho v Coeur d'Alene Tribe of Idaho, 521 US at 269). There is no such thing as "the supreme authority of state law" when it comes to Native American nations or their officials acting in their official capacities and within the scope of their authority (see Washington v Confederated Tribes of Colville Reservation, 447 US at 154 ["tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States"]; see also Kiowa Tribe of Okla. v Manufacturing Technologies, Inc., 523 US at 756). I find that, by relying on Ex parte Young to deny the Shinnecock Nation Trustees their defense of sovereign immunity, the majority effectively endorses the State's nonexistent authority over the [*23]Shinnecock Nation in violation of long-established principles of Native American nation sovereignty. I thus agree with the determination of the United States District Court for the Eastern District of California in California v Azuma Corp. (2024 WL 266121, *5, 2024 US Dist LEXIS 12817, *15 [ED Cal, No. 2:23-cv-00743-KJM-DB]) that "violations of state law do not implicate the Ex parte Young doctrine," and that "the tribal officers, as sued in their official capacities, are immune from liability for violations of state law."
I find no express conflict with the Supreme Court's language in Michigan v Bay Mills Indian Community (572 US 782) that Native American nation sovereign immunity does not bar a state suit "for injunctive relief against individuals, including tribal officers, responsible for unlawful conduct" in violation of state law (id. at 796). Nowhere in Michigan v Bay Mills Indian Community does the Supreme Court state that Ex parte Young may be used to commence an action against Native American nation officials acting in their official capacities to enjoin violations of state law. The discussions to the contrary in Gingras v Think Fin., Inc. (922 F3d 112, 123 [2d Cir]) and Hengle v Treppa (19 F4th 324 [4th Cir]) do not persuade me.
Further, even if Ex parte Young permits a state suit for prospective injunctive relief against Native American nation officials acting in their official capacities to enjoin off-reservation violations of state law, I believe that the majority's application of Ex parte Young in this case exceeds the permissible limits of the exception and thereby implicates the Shinnecock Nation as the real party in interest. "There are . . . limits to what sort of relief a plaintiff may seek under Ex parte Young without making the sovereign the real party in interest" (Jamul Action Comm. v Simermeyer, 974 F3d 984, 994 [9th Cir]). Ex parte Young authorizes prospective injunctive relief to end an official's ongoing violation of the law (see Ex parte Young, 209 US at 159; see generally T.W. v New York State Bd. of Law Examiners, 110 F4th 71, 91 [2d Cir]). A claim against an official that would "'compel [him or her] to act'" is a claim against the sovereign and is not permitted (Dugan v Rank, 372 US 609, 620, quoting Larson v Domestic and Foreign Commerce Corp., 337 US 682, 704). This limitation preserves the "fiction" that when an official is commanded "to do nothing more than refrain from violating [the] law, he [or she] is not the [sovereign] for sovereign-immunity purposes" (Virginia Office for Protection and Advocacy v Stewart, 563 US at 255 [internal quotation marks omitted]).
Here, the majority holds that the State is permitted to seek—in addition to an injunction enjoining the Shinnecock Nation Trustees from further violating State law—to compel the Shinnecock Nation Trustees to remove so much of the Shinnecock Nation structures as have already been constructed and to restore the affected portion of the State's right-of-way. In my view, this additional relief runs against the Shinnecock Nation itself, making it the real party in interest, and thereby impermissibly invades the sovereignty of the Shinnecock Nation (see Pennhurst State School and Hospital v Halderman, 465 US at 101 n 11; Nahno-Lopez v Houser, 627 F Supp 2d 1269, 1283 [WD Okla], affd 625 F3d 1279 [10th Cir]; see also Long Is. Pure Water Ltd. v Cuomo, 375 F Supp 3d 209, 217 [ED NY]). It is one thing to conclude that the State may obtain an injunction enjoining the Shinnecock Nation Trustees from acting to violate its laws. It is altogether different to permit the State to compel the Shinnecock Nation Trustees to undertake action in their official capacities on behalf of the Shinnecock Nation.
Lastly, for the reasons stated in the order appealed from (see Commissioner of the N.Y. State Dept. of Transp. v Polite, 67 Misc 3d 1222[A], 2020 NY Slip Op 50610[U] [Sup Ct, Suffolk County]), I find that the plaintiffs' motion for a preliminary injunction was properly denied (see Doe v Axelrod, 73 NY2d 748, 750). This action is a far cry from a disruptive land claim of the type in City of Sherrill v Oneida Indian Nation of N.Y. (544 US 197) relied upon by the majority. It is pure speculation to find that, if construction of the structures were permitted to continue at this juncture, the Shinnecock Nation would seek to close or reroute the nearby portion of Sunrise Highway that runs through the Westwoods. The structures exist along Sunrise Highway because Sunrise Highway exists. Moreover, although technically located in the State's alleged right-of-way, there is no indication that the structures encroach or otherwise impede traffic on Sunrise Highway.
Accordingly, I vote to reverse the order insofar as appealed from and affirm the order insofar as cross-appealed from.
ENTER:
Darrell M. Joseph
Clerk of the Court

Footnotes

Footnote 1:According to the plans, the bottoms of each structure would display "ICONIC" and the time and temperature.

Footnote 2:The plaintiffs also sought a temporary restraining order. On May 24, 2019, the Supreme Court issued a temporary restraining order directing that, pending the hearing and determination of the motion for a preliminary injunction, the defendants and all entities acting on their behalf were stayed from conducting any and all activities relating to the construction, operation, or maintenance of the structures.

Footnote 3:On appeal, the Trustee defendants assert that they opposed the plaintiffs' motion for a preliminary injunction upon the basis that the Supreme Court lacked subject matter jurisdiction over them as a result of the Nation's sovereign immunity. However, there is no copy of any written opposition to the plaintiffs' motion from the Trustee defendants in the record on appeal, nor is there any indication that they submitted any evidence to oppose the plaintiffs' motion, although they did oppose the plaintiffs' motion at oral argument before the court.

Footnote 4:25 USC § 2703(4) defines "Indian lands" as
"(A) all lands within the limits of any Indian reservation; and (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States government against alienation and over which an Indian tribe exercises governmental powers" (see Michigan v Bay Mills Indian Community, 572 US at 785 n 1; Cayuga Indian Nation of N.Y. v Gould, 14 NY3d 614, 637).

Footnote 5:Kiowa Tribe of Okla. v Manufacturing Technologies, Inc. (523 US at 760) held that Native American nations enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation.

Footnote 6:We are also aware of an unpublished California state court decision holding that certain causes of action against Native American nation officials sued in their official capacities under an Ex parte Young theory could not proceed because they alleged only violations of state law (see Tule Lake Comm. v Follis, 2024 WL 2827178, *6, 2024 Cal App Unpub LEXIS 3455, *14-15 [Cal Ct App, No. C098505]). Initially, we note that Tule Lake Comm. v Follis did not discuss or cite to Bay Mills. In any event, for the reasons set forth herein, we respectfully disagree with the decision in Tule Lake Comm. v Follis.

Footnote 7:In a footnote in their reply memorandum of law before the Supreme Court, the Trustee defendants stated that although they did not concede that New York State law applied to the Westwoods or that the Westwoods was not Indian lands, "this issue is immaterial to a determination of the . . .Trustee [d]efendants' right to sovereign immunity."

Footnote 8:We find Save the Val., LLC v Santa Ynez Band of Chumash Indians (2015 WL 12552060, 2015 US Dist LEXIS 181545) to be distinguishable from the instant case for similar reasons. In that case, where the plaintiffs sought to halt construction of a casino on property that they disputed was a reservation, the United States District Court for the Central District of California held that regardless of whether the property was a reservation, seeking to enjoin, stay, and prevent the Native American nation from proceeding with any further construction of the casino to prevent harm to property values was relief that ran against the nation and was not permitted under an Ex parte Young theory (see 2015 WL 12552060, *1, 4, 2015 US Dist LEXIS 181545, *1-4, 9-10). However, other parts of the decision in Save the Val., LLC v Santa Ynez Band of Chumash Indians indicate that there was evidence that the property on which the casino was located was land held in trust by the federal government for the benefit of the Native American nation and the court viewed the action as the equivalent of a quiet title action because the court would be required to determine the ownership of the property and the manner in which the property was owned (see 2015 WL 12552060, *5, 2015 US Dist LEXIS 181545, *11-13). In our view, this makes the situation in Save the Val., LLC v Santa Ynez Band of Chumash Indians closer to the exception articulated in Idaho v Couer d'Alene Tribe of Idhao, even if the court did not expressly rely upon that exception (see 2015 WL 12552060, *1, 2015 US Dist LEXIS 181545, *1).

Footnote 9:We also note that Nahno-Lopez v Houser was decided prior to Bay Mills.

Footnote 10:In Oklahoma Tax Comm'n v Citizen Band Potawatomi Tribe of Okla. (498 US 505, 514), the Supreme Court stated that negotiations between states and Native American nations, as well as seeking appropriate legislation from Congress, are adequate alternatives to actions against Native American nations themselves when such actions are barred by the nations' sovereign immunity (but see Upper Skagit Tribe v Lundgren, 584 US 554, 562 [Roberts, Ch. J., concurring] [rejecting the contention that negotiation between a Native American nation and an adjoining landowner was a meaningful remedy]). However, Oklahoma Tax Comm'n v Citizen Band Potawatomi Tribe of Okla. did not involve the issue of nonjoinder of a necessary party. Moreover, as discussed extensively above, the Supreme Court has also recognized actions against Native American nation officials under an Ex parte Young theory as an alternative to actions against Native American nations themselves (see Michigan v Bay Mills Indian Community, 572 US at 795).

Footnote 11:W Although the definition of "Indian country" in 18 USC § 1151 by its terms relates only to federal criminal jurisdiction, the United States Supreme Court has recognized that it also generally applies to questions of civil jurisdiction (see Alaska v Native Village of Venetie Tribal Government, 522 US at 527).

Footnote 12:In addition to a copy of the vacated decision in the federal court action, the plaintiffs submitted a copy of the proposed joint pretrial order in that action, which stated, among other things, that the Nation "currently has fee simple title" to the Westwoods. Even assuming, only for the argument's sake of argument, that we can consider this proposed joint pretrial order at all in light of the subsequent vacatur of the Eastern District of New York's decision, it does not help the plaintiffs here. In the context of collateral estoppel, an issue is not actually litigated if it was settled by stipulation (see Kaufman v Eli Lilly & Co., 65 NY2d 449, 457; Matter of Singh v New York State Div. of Human Rights, 186 AD3d 1694, 1696; Douglas Elliman, LLC v Silver, 143 AD3d 752, 755), and we think the instant situation is sufficiently analogous. We also point out that the concession by the Nation's attorneys in the federal court action that the Nation owned the Westwoods in fee simple did not resolve the dispute in that case as to whether the Nation's aboriginal title to the Westwoods had been extinguished—as demonstrated by the need for a 30-day bench trial even after that concession. 

Footnote 13:Although the Eastern District of New York in the federal court action also addressed the disruptive consequences of the casino development project in the Westwoods under the doctrine of City of Sherrill (see New York v Shinnecock Indian Nation, 523 F Supp 2d at 279-291), for the reasons discussed above, we do not rely upon that decision.

Footnote 14:Although we note that in connection with the federal court action, which was commenced in 2003 (see New York v Shinnecock Indian Nation, 274 F Supp 2d 268, 269 [ED NY]), the Nation claimed sovereignty over the Westwoods for purposes of the casino project, there is no indication that it sought to specifically challenge the State's ability to regulate the highway right-of-way at issue in this case (see New York v Shinnecock Indian Nation, 523 F Supp 2d at 192)..T Although we note that in connection with the federal court action, which was commenced in 3002 (see ), there is no indication that they sought to specifically challenge the State's ability to regulate the highway right of way. There is no indication in the record that the Nation sought to assert sovereignty over the Westwoods prior to 3002.

Footnote 15:Although the commercial defendants purportedly provided a supplemental affidavit to the Supreme Court with an attached study on the effect of electronic billboards on traffic, those materials are outside the record on appealmotion.